Opinion delivered March 20, 1889.

---

## No. 2701.

## FRANK WOOD *v.* THE STATE.

1. ASSAULT TO MURDER—INTENT.—The essential ingredient of the offense of assault with intent to murder is that the assault was accompanied by the specific intent of the accused to murder, and this ingredient must be established to the satisfaction of the jury.

2. SAME.—The offense of assault with intent to murder is proved when it is shown that, had death resulted from the assault, the offense would have been murder. Another test is that "if the assault is voluntary, committed with deliberate design and with an instrument capable of producing death in such manner as evidences an intention to take life, and there are no extenuating circumstances, it is an assault with intent to murder."

3. SAME—PRESUMPTION.—The rule is statutory that "the intention to commit an offense is presumed whenever the means used is such as would ordinarily result in the forbidden act." And it is elementary that ' a man is always presumed to intend that which is the necessary or even probable consequence of his acts, unless the contrary appears."

4. SAME—ABANDONMENT—PRACTICE IN COURT OF APPEALS.—If a party, intending to commit murder, uses a deadly weapon in such a manner as that his intent is apparent or may be fairly inferred from the act, he can not, by abandoning any further attempt at violence, mitigate the effect of his previous act or intention; and it is for the jury to determine, under appropriate instructions upon the law, whether, by what he did before he abandoned the further execution of his plans, he really and in fact intended to commit murder. And if they find that he did so intend to commit murder, and the facts justify the finding, then this court will not interfere with the verdict.

5. ASSAULT TO MURDER—FACT CASE.—The statement of the case for evidence held sufficient to support a conviction for assault to murder.

APPEAL from the District Court of Bell. Tried below before the Hon. W. A. Blackburn.

The conviction in this case was for an assault with intent to murder one Isaac Grubbs, and the penalty assessed by the verdict was a term of two years in the penitentiary.

Isaac Grubbs was the first witness for the State. He testified that on the evening of July 13, 1887—the day alleged in the indictment as the date of the offense—he and his brother drove some cows from their home to a water hole in a pasture, and after watering the cows turned them out of the pasture into a lane. When the last cow was driven out of the pasture the witness got off his horse to shut the pasture gate. About that time the defendant, who was in the pasture, rode up to the gate and said: "Hello!" Witness made no reply but continued closing the gate until it pressed against the defendant's horse, when defendant again said: "Hello!" Witness then replied: "How do you do?" Defendant asked: "Do you want to settle that?" Witness asked, in reply: "Settle what?" Defendant said: "That racket at the school house." Witness replied: "No; go away and let me alone; I want no trouble with you." Defendant said: "You would not have bucked up to me the way you did at the school house if Henry Easterling had not put you up to it. He put you up to it." The witness told him in reply that Easterling did no such thing. Defendant replied: "You are a liar, you son of a bitch!" He then crowded his horse against witness, and witness said to him: "Don't ride over me." Defendant replied: "I don't want to ride over you; I want you in the pasture; I will fix you there." He then struck at witness, or threw out his left hand at witness. Witness caught defendant's shirt sleeve and tore it off. Defendant then said: "I will do you up!" and thrust his hand into his pocket. He withdrew his hand with nothing in it, and then thrust it back into his pocket and withdrew it with a knife. He then opened the knife, got off his horse, and he and witness went to fighting. Witness was unable to say whether he or the defendant struck the first blow, but the defendant cut him in four places with the knife. One of the cuts began in the hair about an inch above the forehead, and extended down the forehead to the corner of the eye and nose, whence it skipped to the mouth, cutting the under lip and chin, and entering the neck at the collar or breast bone. Another cut on the left side of the neck was about five inches long. Another was a short cut under the left shoulder blade. The fourth was a cut seven inches long which extended from the left side to the breast.

The said wounds confined the witness to his room about two weeks under the care of Dr. Mills. No person interfered to stop the fight—the parties quit of their own accord and caught their horses. As witness and defendant passed through the pasture gate after the cutting, the defendant said to witness: "You know you called me a son of a bitch, and struck me first." The witness had no weapon of any kind—not even a pocket knife—at the time of the fight.

Cross examined, the witness denied positively that he called the defendant either a liar or a son of a bitch. Just before the defendant accosted witness, the witness saw Loony Wood, the defendant's brother, going up the lane. He did not know how far Looney was from the pasture gate at the time of the fight. Dan Elliott and the witness's brother were present when the fight occurred—Elliott having come with the defendant. The witness denied that he struck at the defendant before the defendant dismounted, but, when defendant struck at him before dismounting, he caught defendant's sleeve and tore it off. The witness used his fist against the defendant's knife, which, as well as witness could judge by the view he got of it, was a medium sized red handled pocket knife. The next time the witness saw the defendant was in court about six months prior to this trial.

Dr. Mills, for the State, described the wounds on the person of Grubbs substantially as Grubbs described them, and stated that he at no time considered the said wounds as dangerous except in their liability to cause erysipelas.

Lee Grubbs, the brother of the injured party, was the next witness for the State. He testified that he was present and witnessed the difficulty between his brother Isaac and the defendant, which he detailed in substantially the same language as that used by Isaac in his testimony. He added that after the parties had quit fighting of their own accord, Dan Elliott said to the defendant: "You have done enough; let him alone." He was positive that Isaac did not call the defendant either a liar or a son of a bitch.

William Taylor, deputy sheriff of Bell county, testified, for the State, that, about six months prior to this trial (which was had in January, 1889), he received word from the sheriff of Lamar county that he had the defendant in custody. He went to Lamar county, about three hundred miles distant, and got defendant.

The State closed.

Dan Elliott was the first witness for the defense. He testified that he was at the house of his mother-in-law, in Bell county, on the morning of July 13, 1887, when defendant and his brother came there on their way to Temple. They asked witness to go with them, which invitation the witness at first declined on the ground that he had nothing at the house to ride except a wild horse, of which he was afraid. The defendant proposed to ride the wild horse and lend his gentle horse to witness, whereupon witness agreed to and did accompany them to Temple. When they reached the lane referred to by the State's witnesses on their return in the evening, Loony Wood was riding eighty or a hundred steps in advance of witness and defendant. The horse ridden by the defendant frightened at a small bridge, and would not cross it until defendant struck him a severe blow with a quirt, whereupon the horse ran across the bridge, and to the pasture gate where Isaac Grubbs was. Witness rode on slowly, and, as he approached the gate, he heard defendant say to Grubbs: "You would not have bucked up to me like you did if Henry Easterling had not put you up to it." Isaac replied: "Don't you ride over me." Defendant said: "I am not going to ride over you." Grubbs replied: "You lie, you son of a bitch!" and struck or struck at defendant, it being the first blow passed or attempted. Defendant then said to Grubbs: "You called me a son of a bitch, and you have got to take it back." Grubbs denied that he had called defendant a son of a bitch. Defendant then got off his horse and he and Grubbs went to fighting, in the course of which fight Grubbs was cut. Grubbs struck the first blow while defendant was on his horse. The parties were not interfered with, and they stopped fighting of their own accord. As defendant passed out through the pasture gate, he said to Grubbs: "You know you called me a son of a bitch, and struck me first."

Cross examined, the witness said that the bridge where the defendant's horse became frightened was about seventy-five yards distant from the pasture gate at which Grubbs was standing and where the fight occurred. The defendant's horse ran immediately up to Grubbs and was very near Grubbs throughout the preliminary talk or quarrel. Defendant pulled out and opened his knife before he got off his horse. He got off his horse on the side next to and very near Grubbs, and they began

fighting at once. Witness went to the house of the defendant's father on the morning after the fight, and while there told the parties present that when defendant pulled his knife he, witness, called to defendant: "Don't do that," and attempted to get down, but that his spur got hung in the stirrup and prevented him. He did not remember that at the same time he told the said parties that he saw nothing more, after calling on defendant not to use his knife until the parties began fighting. If he made that statement it was the truth, as the facts were then fresh in his mind. As a matter of fact he did, when he saw defendant pulling out his knife, call on him "not to do that."

Mrs. Wood, the defendant's mother, testified, in his behalf, that the knife owned by the defendant at the time of the fight with Isaac Grubbs, was a "small two bit red handled knife, with a blade about an inch and a half long."

Loony Wood, the brother of the defendant, testified, in his behalf, that he was between eighty and a hundred yards from and in advance of defendant when the fight occurred. Witness's attention was attracted by the voice of Isaac Grubbs calling defendant a "lying son of a bitch." He then looked back and saw the defendant get off of his horse and enter into a fight with Isaac Grubbs. He did not go back, nor did he attempt to stop the fight, supposing it to be merely a fist fight, and knowing the parties to be about evenly matched. When the defendant overtook him, after the fight, he saw that one of defendant's shirt sleeves was torn off, that the breast of his shirt had a small cut in if, and that one of defendant's fingers was split. Defendant's knife was a small single bladed, red handled instrument, the blade being one and a half or two inches long.

On cross examination, the witness said that he had a conversation with Bal Bingham on the day after the fight, but he did not remember telling said Bingham that he did not see the fight because of the corn, which was too high for him to see over it. Defendant, instead of going home that night, went with witness and Elliott as far as Mrs. Easterling's house and left. Witness next saw him on the following Christmas in Corsicana.

The defense closed.

R. A. Bingham testified, for the State, in rebuttal, that Isaac Grubbs stopped at his house after the cutting and got him to

examine his wounds. On the next day Loony Wood came to witness's house and asked him if Grubbs was badly cut, and in the conversation that ensued remarked that he regretted the occurrence very much, and that he did not see the fight because of the high corn between where he was at that time and the place where the fight occurred.

D. N. Grubbs, the father of Isaac Grubbs (corroborated by C. C. Grubbs), testified, for the State, that Dan Elliott came to his house on the morning after the cutting, and said to witness: "You must not think hard of me, for I had nothing to do with it." Witness asked him why he did not stop the fight. He replied that when defendant started to draw the knife he called to him "not to do that," and attempted to dismount, but his spur got hung and prevented him, and that when he got his foot clear of the saddle the fight was over.

*Harris & Saunders*, for the appellant: With reference to the intent of the defendant we respectfully submit to this court that there is not a syllable of evidence, either on the part of the State or of the defendant, showing or tending to show any intention on the part of defendant to take the life of Grubbs. On the contrary, all the testimony shows the very reverse to be the case. While there is some difference between the witnesses as to whether the first blow was struck by Grubbs or the defendant, they all agree that after the boys had mutually fought a very short time they both stopped fighting of their own accord (no one interfering to stop them), and boylike walked out of the gate together and went in the same direction up the lane to catch their horses, and the little fight was over.

It seems these two boys had a few days before some little "unpleasantness" at school (as boys have had "from the time whereof the memory of man runneth not to the contrary," as school boys have every day all over the world, and as they will continue to have until schools and school boys are no more), in which defendant thought Grubbs had, perhaps under the patronage of one Easterling, unjustly domineered over him, and by the conjunction of the accident of his horse running away with him and the coincidence of carrying him up to where Grubbs was just coming out of a gate into the lane he was, without his own volition, brought up to Grubbs, when, after some words between them and. as two witnesses testify, after he

was called a liar and son of a bitch, and was struck by Grubbs, he drew his pocket knife and dismounted, and they went to fighting. True, he inflicted three or four slight wounds upon Grubbs during the fight, with his pocket knife; but was it a deadly weapon? We think clearly not. The proof shows it was a very small red handled two bit pocket knife, with but one blade and that only an inch to one inch and a half long. Grubbs evidently did not regard it as a dangerous weapon, for, after he struck defendant and tore off his shirt sleeve as he attempted evidently to pull the defendant off his horse, he saw defendant take it out of his pocket and dismount, when, as he says, he commenced fighting defendant with his fist. And under all the circumstances, considering the relative strength of the two boys and the smallness of the knife, it could hardly be used by the defendant so as to be called a deadly weapon. Nor was it so used. Dr. Mills, who dressed the wounds on Grubbs, says he never considered the wounds inflicted as likely to produce death, or even at all dangerous of themselves. Then we are forced to conclude that, both from the insignificance of the weapon used and the manner of its use, it is patent to the most ordinary unprejudiced mind that the defendant neither intended or contemplated taking the life of Grubbs.

Is there any other evidence that is uncontradicted that evidently shows that defendant had no murder in his heart? There is undoubtedly evidence that removes even all doubt on this point. Evidence I may say "that pleads like angels trumpet tongued against this most unwarranted and inhuman conviction." It is the unanimous testimony of the witnesses both for the State and defendant that the boys "stopped fighting of their own accord; that no one interfered to stop them, and they walked out of the gate together; went up the lane and caught their horses," and no reference was made to their difficulty except that defendant, evidently giving his reasons why he had fought, said to Grubbs, just as they came out, "you know you struck me first, and called me a damned son of a bitch;" which Grubbs did not then deny. Now we submit that if (as is universally admitted to be true) the most convincing test of the intent of a party in a difficulty is what he does, then, tested by this rule, the mere fact that the defendant voluntarily, and without any interference or persuasion on the part of any one, ceased to fight Grubbs before he had inflicted upon him any serious bodily injury, when, as is charged, he had in

his hand a deadly weapon and had every opportunity to take his life, is proof convinsive he had no such intention, and the conviction in this case is a shock to that sense of "even handed justice" which should always control juries in their deliberations.

This is nothing more nor less, at worst, than a mutual combat between these two boys, in which defendant took no advantage of Grubbs after engaging in the fight. For all the witnesses agree that before he got down off his horse—but not until after Grubbs had torn off his shirt sleeve, in trying evidently to pull him off his horse—did he draw his little pocket knife, which he did in full view of Grubbs, who says he saw him do it, and also says he went for the defendant, nevertheless, as soon as he struck the ground. Now where is the unfair advantage?

But did not Grubbs also use a knife or some other sharp instrument? We think that the evidence clearly shows that he did. The testimony of Loony Wood is: "Defendant's shirt sleeve, after the difficulty, was off. One of his fingers was also split open, and he had a little cut place in the front part of his shirt." This testimony is uncontradicted. Now we submit to this learned, impartial and honorable court, the facts proved do not warrant the conviction in this case. He has not had justice done him—that justice which is the pride and glory of our land and the heritage of its humblest citizen. We are fully aware of the disinclination of the courts, particularly in civil matters, to disturb the verdicts of juries where there is any reasonable excuse to uphold them; but in cases of the character of this, where technicalities are disregarded, when the great question of human liberty is involved, our law deals alone with the solitary fact of guilt or innocence, and will scrutinize with rigid rules the acts of juries, and visit their short comings with the prompt and ready hand of correction.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. At a former day of the present term we affirmed the judgment in this case without a written opinion. Distinguished counsel, representing appellant, have filed a motion for rehearing, and in addition to the able printed brief originally filed we have been favored and profoundly impressed with the oral argument submitted upon the issue

presented in the motion.   We are free to confess that the positions assumed in the argument are most plausible and persuasive, and, had we been upon the trial jury trying the case, it may be that under the facts we might have arrived at a different conclusion as to the grade and nature of the crime and the punishment to be awarded.   We must, however, take the record as here presented, and if upon the record it appears that no material error has been committed in the trial below, and if the evidence, applied to the law, warrants and sustains the verdict and judgment, then, whatever might be our private opinion, feeling or sympathy, our duty is plain and the judgment must be affirmed.

Appellant was indicted for and has been tried and convicted of assault with intent to murder one Isaac Grubbs.   We take the following statement of the material facts, which we have verified and found correct, from the printed brief of appellant's counsel:

Isaac Grubbs testified in substance that on the thirteenth day of July, 1887, while he was at the pasture gate, defendant rode up and hallooed "hello" twice; that he (Grubbs) said, "how do you do."   That defendant said "do you want settle that?"   That he asked him what ?   That defendant referred to a matter that had occurred at the school house.   That he told him to go away and let him alone; that he wanted no trouble with him.   That defendant accused Henry Easterling of putting him up to attacking defendant at the school house.   That he denied it.   That defendant said, "you lie, you son of a bitch."   That he told defendant not to ride over him.   Defendant said he did not want to, that he wanted to fix him, etc.; that defendant threw out his left hand at him—could not tell whether defendant's hand was closed or open,—that he caught the defendant's shirt sleeve and tore it off.   Defendant then said, "I'll do you up."   Defendant pulled out his knife, opened it and got down, and they went to fighting; can't say which struck the first blow; that during the fight defendant cut him in four places with his pocket knife (describes the wounds); that he and defendant quit fighting of their own accord; defendant said to him, "now you can go home;" they both went on in the same direction.   As they went out of the gate, defendant said to him, "you know you struck me first and called me a son of a bitch;" that he had no knife and is positive he did not call defendant either a son of a bitch or liar.

Dr. Mills, for the State, described the locality and character of the wounds, and in addition stated, "I did not consider that the wounds as made were at all likely to produce death, or were dangerous." Lee Grubbs testified substantially as his brother. William Taylor, deputy sheriff, testified for the State that he went to Lamar county and got defendant, and brought him to Bell county about six months ago.

Daniel Elliott, for defendant, testified substantially that he went to and returned from Temple with defendant and his brother; defendant was riding a wild horse of witness's. As they returned in the evening, defendant's horse scared at a little bridge; defendant hit his horse with his quirt; the horse jumped the bridge and ran with defendant down to where the prosecuting witness, Grubbs, was at the gate; that he, witness, rode on after him slowly; heard Isaac Grubbs say to defendant, "you lie, you son of a bitch," and saw him strike defendant, or strike at him; defendant then said, "you called me a son of a bitch, and you have got to take it back;" Grubbs denied calling defendant a son of a bitch; defendant then got off his horse and they both went to fighting one another; Grubbs struck defendant first while he was on his horse; they quit fighting of their own accord; he told defendant after they had stopped that he had done enough; saw all the fight and was not related to either party.

Mrs. Wood, defendant's mother, testified that defendant was nineteen years old the seventeenth of October, 1888; was married on the tenth of October; his knife was a two bit one bladed red handled pocket knife, blade one to one and a half inches long.

A notable and indeed the important fact relied upon by appellant to show that his offense can not be assault with intent to murder is that, after inflicting the blows given, he of his own accord stopped voluntarily and abandoned the further prosecution of the fight. Learned counsel say in their argument "now we submit that if (as is universally admitted to be true) the most convincing test of the intent of a party in a difficulty is what he does, then, tested by this rule, the mere fact that the defendant voluntarily, and without any interference or persuasion on the part of any one, ceased to fight Grubbs before he had inflicted upon him any serious bodily injury, when, as charged, he had in his hand a deadly weapon and had every opportunity to take his life is proof convincive that he

had no such intention, and the conviction in this case is a shock to that sense of 'even handed justice' which should always control juries in their deliberations."

There is no better settled rule of law than that, in assault with intent to murder, there must be *a specific* intent to murder. This intent is the essential ingredient of the offense, and its existence must be proven to the satisfaction of the jury. (Willson's Crim. Stats., secs. 857, 858, 859, and authorities collated; McCullough v. The State, 24 Texas Ct. App., 128; Moore et al. v. The State, 26 Texas Ct. App., 322.)

Article 502, Penal Code, provides, as a test on the trial of one charged with this crime, that "whenever it appears upon a trial for an assault with intent to murder that the offense would have been murder had death resulted therefrom, the person committing such assault is deemed to have done the same with that intent." In Yanez v. The State, 20 Texas, it is held that "if the assault is voluntary, committed with deliberate design, and with an instrument capable of producing death in such manner as evidences an intention to take the life, and there are no extenuating circumstances, it is an assault with intent to murder."

In article 50 of our Penal Code it is provided that the "intention to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden act." It is also an elementary rule, and one of universal application, that "a man is always presumed to intend that which is the necessary or even probable consequence of his acts, unless the contrary appears." (McCoy v. The State, 25 Texas, 42; Aiken v. The State, 10 Texas Ct. App., 610; High v. The State, 26 Texas Ct. App., 546.)

Mr. Bishop says: "If a man undertakes to do a particular wrong of the indictable sort, and does some act towards it but fails to complete what he meant, his evil intent and act together constitute * * a common law crime, provided the act is not too trivial and small for the law's notice. For the intent is sufficient, and the adequacy of the act is the only further object of inquiry. Therefore an attempt is an intent to do a particular thing which the law, common or statutory, has declared to be a crime, coupled with an act toward the doing sufficient both in magnitude and proximity to the fact intended to be taken cognizance of by the law, that does not concern itself with things trivial and small. Or, more briefly, an attempt is an

intent to do a particular criminal thing, with an act toward it falling short of the thing intended." (1 Bish. Crim. L., 7 ed., secs. 727, 728.) Further on the same learned author says: "On an indictment for a technical attempt the jury may take into view the nature of an act proved, to determine the intent which prompted it." (Id., sec. 735.)

As was said by Campbell, J., in The People v. Scott, 6 Mich., 287: "The intent to kill must be established as an inference of fact, to the satisfaction of the jury; but they may draw that inference, as they draw all other inferences, from any fact in evidence which to their minds fairly proves its existence. Intentions can only be proved by acts, as juries can not look into the breasts of criminals." (Trevinio v. The State, ante, 372.) The case of Jeff (a slave) v. The State, 39 Mississippi, 593, was where the accused had inflicted several wounds with a knife, a deadly weapon, but who, when the injured party released his hold of him, ran off without attempting further violence. The opinion is a most able and elaborate one, in which leading authorities, English and American, are reviewed and the conclusions of the court, as stated in the syllabus, are that "the law presumes that a party intends to do not only what he actually accomplishes, but also the natural and even probable consequences of his own acts when deliberately done; and hence, in considering technical attempts, the jury may take into consideration the nature of the act done and the attendant circumstances as matter of evidence to determine the particular intent with which it was performed; they may infer the specific intent to do a particular thing which is the necessary, natural or even probable consequence of the act proven to have been done. It is a probable consequence of the use of a deadly weapon in an assault and battery committed by one person on another that the death of the party assaulted may ensue; and hence proof of such use is *prima facie* evidence of an intent to kill, which must prevail unless overcome by other proof in the cause.

If a party intending to commit murder uses a deadly weapon in such a manner as that his intent is apparent, or may be fairly inferred from the act, he can not, by abandoning any further attempt at violence, lessen the effect of his previous acts and intentions, because they have already become accomplished facts. His crime has already been committed; he can not abandon what he has already done. It is for the jury to

determine, under appropriate instructions from the court upon the law, as to whether by what he did before he abandoned the further execution and accomplishment of his plans, he really, and in fact intended, to commit murder. If they so find, and the facts are of a character to justify the finding, then this court can not interfere with the finding.

In the case in hand, the jury might have inferred, as they did, from the facts proven, that appellant, up to the time he stopped using his knife, intended to kill Grubbs. We can not say that such a finding is either against or is not warranted by the facts proven. There is no question made as to the sufficiency of the charge of the court in its presentation of the law applicable to the various phases of the case, and all the special requested instructions asked by able counsel in behalf of appellant were given. If there has been any error of omission or commission in the charge of the court, we have failed to find it.

We have given this case our most mature consideration, and we are constrained to say that, as it is presented to us in the record, we do not feel that we would be warranted or authorized to interfere with the verdict and judgment. The motion for rehearing is, therefore, overruled.

*Motion overruled.*