Ira **WILLIAMS, Jr.,** Appellant,

v.

The **STATE** of Texas, Appellee.

No. 42390.

Court of Criminal Appeals of Texas.

Dec. 3, 1969.

Rehearing Denied Feb. 11, 1970.

C. C. Divine, Houston, for appellant.

D. Brooks Cofer, Jr., Dist. Atty., Bryan, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

BELCHER, Judge.

The offense is assault with intent to murder with malice; the punishment, five years.

The trial was before the court without the intervention of a jury.

The first ground of error is that there is a fatal variance between the indictment which alleged that the appellant, with malice, shot Pat Gooden with a pistol with the intent to murder him and the evidence which fails to show that he shot him.

The testimony that the appellant entered the tavern with the loaded pistol in his hand and his finger on the trigger, pointed it to Gooden's head while standing at the table where Gooden was sitting, and when Gooden struck his hand the pistol fired, Gooden jumped up and they grappled over the pistol, the pistol snapped several times, which the appellant, while testifying, stated that he could not explain, and he released the pistol only after an order and a warning shot from an officer to drop it, was sufficient to constitute an assault with intent to murder, and supports the finding of the trial judge that the appellant is guilty of the offense of assault with intent to murder with malice. The variance as contended is not fatal. The first ground of error is overruled. 4 Branch 2d 168, Sec. 1797; Carr v. State, 41 Tex. 543, 547; McIntire v. State, 105 Tex.Cr.R. 403, 289 S.W. 48; Perez v. State, 114 Tex.Cr.R. 473, 22 S.W.2d 309.

The second ground urged as error is that the evidence is insufficient to support a conviction for assault with intent to murder with malice.

The evidence of the state reveals that Pat Gooden, the alleged assaulted party, arrived at Tick Tock Tavern about 5 p. m., and after he had been sitting at a table with two men for two or three minutes, he first saw the appellant with a pistol in his hand standing beside him as he sat at the table. The appellant pointed the pistol at the side of Gooden's head and said, "hit it," or "you hit it," or "you are in it," and when Gooden struck his hand the pistol fired and Gooden jumped up and they began tussling, and Gooden said, "What's the matter, Junior Boy?" and then he pushed the appellant against a post and held him until an officer arrived. The appellant held the pistol by the butt with his finger on the trigger, and Gooden had one hand on the barrel. After Officer Calhoun shot through the window, the appellant then threw the pistol out the door.

Officer Calhoun testified that he first saw the appellant at Shady Grove Tavern where he had been called about a disturbance; that the appellant was angry because Joe Smith had cut him with a knife; that when he told the appellant to calm down and go home the appellant replied that he was going by Tick Tock (which was about one-half block away), drink a beer and go home. About five minutes after the appellant left, Officer Calhoun got a call to come to Tick Tock. When he arrived he saw the appellant and Gooden tussling over a revolver.

Officer Calhoun further testified as follows:

"A I asked the Defendant to drop the weapon and back away from him, and he stated that he was not.

\* \* \* \* \* \*

"A I asked him to drop the weapon again and he would not, and I moved for cover around the door. At that time, he was still pointing it at me. I fired one shot from my revolver and asked him to throw the weapon out, and when I cocked the gun again he threw it out, \* \*.

\* \* \* \* \* \*

"Q Would you tell the Court what State's Exhibit 1 is, Officer Calhoun?

"A It is marked.

"Q Just go ahead and tell the Court what it is, if you would?

"A It is a 32 revolver, nickel-plated.

"Q You say that you have placed your identifying initials on the weapon?

"A Yes, sir.

"Q When did you do that?

"A After we picked the weapon up and marked it and brought it in.

"Q Would you tell the Court where you got this weapon? Where did you pick it up?

"A At the Shady Grove.

"Q At the Shady Grove?

"A Tick Tock, I mean; correction.

"Q Is this the one you just testified to, the one that came out the door?

"A Yes, sir, this is the one that came out the door.

"Q You examined the weapon over there at the Tick Tock?

"A Yes, sir, we unloaded it.

"Q Would you tell the Court what appears, in regard to the rounds that you took from the cylinder of the revolver?

"A One round had been fired and three rounds had been fired on but did not fire and one round—the hammer had not struck it yet.

"Q This is the evidence, the pistol and the other evidence, that you have had in your possession at the Police Department since the 22nd of May, 1968; is that right?

"A Yes, sir."

On cross-examination, Officer Calhoun testified:

"Q Now, you have just testified, Officer, that three of these bullets had been fired upon but had failed to discharge?

"A That's right.

\* \* \* \* \* \*

"Q They might; and they might not have been struck with the firing pin there at the Tick Tock Lounge on that night but some other time, mightn't they?

"A I heard the gun snap at the Tick Tock.

"Q You heard it snap, standing on the outside?

"A I was standing approximately ten paces from him.

"Q And you heard it snap?

"A Right.

"Q How many times did you hear it snap?

"A Several times.

"Q 'Several'? is that three, four, five, or how many?

"A Approximately several times. At the time, with that much involved and going on, you don't have time to count the times that a gun is snapped.

"Q You were outside all this time; you actually never entered that place, did you?

"A I entered the door of that place.

\* \* \* \* \* \*

"Q You drove on up to the Tick Tock?

"A Right.

"Q And when you got there, you could look through the window glass and

you could see Gooden and Ira Williams tussling?

"A When I got there, I walked in the doorway.

"Q You walked in the doorway and you saw a tussle?

"A I saw Pat Gooden holding onto the gun, and—

"Q You saw, who?

"A Pat Gooden.

"Q Holding onto the gun or to the wrist or arm of Ira Williams?

"A He was holding onto the gun and Ira, to keep him from shooting it.

'Q That's what you conclude, to keep him from shooting it; you don't know whether he was trying to take it away from him or trying to defend himself?

"A He seemed to be trying to defend himself.

      *    *    *    *    *    *

"Q Did you see who had hold of the butt of the pistol?

"A Ira Williams had hold of the butt and the trigger.

"Q Did you see anybody else's hand on that pistol at the time that Ira Williams had hold of the butt of it? Did you see anybody else's hand on it?

"A I saw Pat's hand on the barrel of it.

      *    *    *    *    *    *

"Q I understand. All right. Did you hear any conversation between those two men at the time that you saw Ira Williams holding the butt of the pistol in his hand, Pat Gooden holding the barrel in his hand? Did you hear either one of them say anything at all at that time?

"A At that time when I asked, I told them, I said, 'It don't make sense for you all to act like this.' I said, 'Drop the gun and break away from it and everythnig will be all right.' Pat said, 'I can't turn it aloose because if I turn it loose he is going to shoot me.' I asked Ira to drop it and Ira said, 'I am not.' At that time I said, 'Pat you break loose from him,' and Pat broke loose.

"Q Then, when he broke loose, he released his grip on the pistol?

"A Right.

"Q Now, then, what I want to know: Did Ira Williams, Jr., at that time make any effort to point the gun at Pat and shoot him?

"A He was pointing it at me, then.

"Q Not at Pat Gooden?

"A Not at Pat Gooden.

"Q Did he snap the hammer then, on that pistol?

"A That's right.

"Q When it was pointed at you?

"A Right.

      *    *    *    *    *    *

"Q When you heard the pistol snap and Ira was pointing it in your direction, were you outside the doorway or inside?

"A I was standing just inside the doorway.

"Q Then, you backed out?

"A I backed out; that's right.

"Q That was before you fired the shot?

"A That was before I fired the shot; right.

"Q Did you go to either side of the door to fire the shot?

"A Right.

"Q Which side?

"A To the left.

"Q How far, just a step or two?

"A Just a step or two. I fired through the glass.

"Q You did not shoot at anybody?

"A I fired down at the left side of his feet.

"Q Could you see him through the glass?

"A I could see him through the glass.

"Q Did he still have the pistol?

"A He still had the pistol.

"Q He had not fired it; you had not heard any gunshot go off?

"A No.

"Q When you got to the glass, just before you pulled the trigger, was it still pointed in your direction?

"A It was still pointed in my direction.

"Q You fired the shot; what exactly happened then?

"A I backed back from the window. Some lady said, 'Please don't kill him.' I said, 'I am going to have to if he don't throw the gun out.' At that time Ira stated, 'I am going to throw it out,' and he throwed it out the door.

"Q You know it was Ira Williams that said that?

"A I know it was him."

The appellant testified that after Joe Smith cut him with a knife at Shady Grove he went outside where he was told that Smith said that he was going to kill him. At this time the appellant got his pistol from his car and went to Tick Tock to talk with Smith about the threat and to straighten things up. Appellant entered Tick Tock holding the pistol in his hand down by his side looking for Smith, and when he passed by Gooden's table, Gooden said, "What's the matter with you, Junior Boy?" and grabbed him. They began struggling; the pistol discharged, and Gooden pushed him against a post. Appellant testified that he had his finger on the trigger, but never pointed the pistol toward Gooden, never intended to injure him, but wanted to keep the pistol to protect himself from Smith who had threatened to kill him. While appellant and Gooden were tussling over the pistol, Officer Calhoun arrived and said, "Drop the gun," and he slid it out the door as a shot was fired through the window. Appellant denied pointing the pistol toward Calhoun. The appellant testified that he would not give the court any explanation as to why the shells in the pistol were snapped.

In considering the contention, in an assault with intent to murder case, that there was an absence of a showing of a specific intent to kill and physical injury to the person upon whom the assault was made, this Court in Hall v. State, 418 S.W.2d 810, said:

"It is well established that a specific intent to kill is an essential element of the offense of assault with intent to murder. The intent to kill is a fact question, the existence of which must be determined by the trier of the facts, judge or jury, from the evidence and cannot be presumed as a matter of law. Hunter v. State, 161 Tex.Cr.R. 225, 275 S.W.2d 803.

"The trier of the facts may, however, infer the intent from any facts in evidence which to his mind proves the existence of such intent to kill, as from the use of a deadly weapon.

"In Kincaid v. State, 150 Tex.Cr.R. 45, 198 S.W.2d 899, this court said:

'The intent to kill is a question of fact to be determined by the jury from all the facts and circumstances in evi-

dence. The intent is hardly ever provable by direct testimony, but is to be inferred from acts, words, and conduct of the party accused. In the instant case, appellant made the assault upon an officer with a deadly weapon, from which, in the absence of any evidence which would excuse or justify his act, an inference arises that he intended to kill. Here, no excuse or justification on the part of appellant is shown. Of course, he fired only one shot but what he had in his mind at the very time he fired the shot was a question of fact for the jury. The fact that he did not hit the officer may have been due to his drunken condition or to bad marksmanship and subsequently he may have abandoned his intent to kill. However, the subsequent abandonment of his intent would not make the assault any the less an assault with intent to murder.'

"See also Wood v. State, 27 Tex.App. 393, 11 S.W. 449.

"Even without the surrounding facts here presented, intent to kill may properly be inferred from the fact that the appellant committed the assault with a deadly weapon. Peterson v. State, Tex. Cr.App., 399 S.W.2d 813; Hernandez v. State, Tex.Cr.App., 375 S.W.2d 285; Flores v. State, 168 Tex.Cr.R. 629, 331 S.W.2d 219. See also 4 Branch's Anno. P.C.2d. p. 173, Sec. 1812.

"Further, proof of infliction of injury is not absolutely essential to a conviction for assault with intent to murder. Hunter v. State, supra; 4 Branch's Anno. P.C.2d, p. 180, Sec. 1829; 29 Tex.Jur.2d 118, Sec. 106.

"In determining the question of the sufficiency of the the evidence to sustain the trial court's finding that appellant intended to kill Officer Hartman, we must consider the evidence in the light most favorable to the State. Jennings v. State, Tex.Cr.App., 367 S.W.2d 670, appeal dismissed and denied 375 U.S. 398, 84 S.Ct. 453. 11 L.Ed.2d 412."

The jury is not bound by the testimony of the parties concerning their friendly relationship before or after the shooting, but may consider all the evidence in the case.

The evidence is sufficient to warrant the jury to find that the appellant committed the assault with a deadly weapon and sustains the conviction.

The second ground of error is overruled.

The judgment is affirmed.

MORRISON, Judge (dissenting).

The indictment charged that appellant assaulted Bob Gooden with intent to murder him. The majority makes out a case against this appellant for assault with a prohibited weapon upon the witness, Officer Calhoun, but Calhoun was not mentioned in the indictment upon which this appellant went to trial.

According to the alleged injured party, Gooden, appellant, who was his friend and with whom he had had no difficulty or ill feelings, approached the table where he was seated in the second tavern with a gun in his hand and said, "something about 'you hit it,' but I don't know exactly what he said." Gooden stated that he arose from the table, grappled with appellant and during the course thereof the pistol was discharged but not in his direction. Then the officer arrived and upon his command appellant threw the pistol out of the tavern and the officer took possession thereof. Gooden stated that in a conversation with appellant immediately after the above incident the appellant told him that he had always considered Gooden as a friend. He testified further that during the affray appellant made no effort to shoot him and that when the pistol went off as the result of his striking appellant's hand, it was not pointing at him. We quote briefly from Gooden's testimony:

"Q. You and he had always been friends before, hadn't you?

A. Sure we was friends.

Q. Never any bad blood or trouble between you?

A. No, sir.

Q. You looked at one another in a friendly manner?

A. Yes, sir.

Q. You treated one another friendly?

A. Yes, sir."

The following authorities support the rule that such an intent must be shown, Gipson v. State, Tex.Cr.App., 403 S.W.2d 794; Hernandez v. State, Tex.Cr.App., 375 S.W.2d 285; Trimble v. State, 148 Tex.Cr. R. 596, 190 S.W.2d 123; Ammann v. State, 145 Tex.Cr.R. 34, 165 S.W.2d 744; Cheeks v. State, 157 Tex.Cr.R. 184, 247 S.W.2d 893; Richard v. State, Tex.Cr.App., 426 S.W.2d 951; Barnes v. State, 172 Tex.Cr. R. 303, 356 S.W.2d 679 and Tex.Cr.App., 366 S.W.2d 586; Robertson v. State, Tex. Cr.App., 426 S.W.2d 872; Johnson v. State, Tex.Cr.App., 421 S.W.2d 918; Daniels v. State, Tex.Cr.App., 215 S.W.2d 624; King v. State, 153 Tex.Cr.R. 422, 220 S.W.2d 647; Henry v. State, 157 Tex.Cr.R. 88, 246 S.W.2d 891; Windham v. State, 162 Tex. Cr.R. 620, 288 S.W.2d 90.

I fail to find the evidence sufficient to support the judgment of the trial court.

I respectfully dissent.