

# NUMBER 13-12-00306-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**JESUS CERVANDO LOPEZ,**                              **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                  **Appellee.**

---

### On appeal from the 103rd District Court
### of Cameron County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Garza, Benavides, and Perkes
### Memorandum Opinion by Justice Perkes

Appellant Jesus Cervando Lopez appeals his conviction of capital murder which was committed during the course of kidnapping or attempted kidnapping. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West 2011). Appellant pleaded "not guilty" to murder and kidnapping, but the jury found him guilty of capital murder. The trial court sentenced appellant to life imprisonment with the possibility of parole. *See* TEX. CRIM. PROC. CODE

ANN. art. 37.071, § 1 (West Supp. 1995). By seven issues, appellant argues: (1) the evidence is insufficient to support his conviction; (2) the trial court misled the jury to think that the jury would assess punishment; (3) the statute mandating a life sentence is unconstitutional; (4) the prosecutor asked an improper cross-examination question that denied appellant due process; (5) the trial court erred by allowing the State to ask appellant whether he had used false names while in Mexico; (6) the State understated its burden of proof during jury argument; and (7) the cumulative effect of the six issues warrants reversal. We affirm.

## I. BACKGROUND

Reynaldo Martinez was found shot to death in a vacant lot of a housing subdivision at around 2:00 a.m. on Saturday, October 24, 1999. Eneyda Montelongo, who had been asleep in a house adjacent to the vacant lot, called 911 because she heard gunshots. Police officers found Martinez's black Mitsubishi Montero about a block away. The driver's and passenger's doors were open and the engine was running, but no one was inside the car. There was blood was on the driver's seat, some .45 caliber shell casings on the street near the passenger's side, and a trail of blood drops from Martinez's car to the vacant lot.

Before the shooting, Martinez was at his cousin's house drinking beer with some family and friends. Servando Martinez, Renalto Garcia Jr., and Francisco Lara, three witnesses who were at that house with Martinez, testified that Martinez was taken after two men, Jesus Camacho and a young man (appellant),[1] arrived in a small sports car.

---

[1] None of these three witnesses identified appellant as the young man who accompanied Camacho; appellant, however, claimed that he was, and the evidence connected him to the sports car.

2

According to the witnesses, Camacho had already come to the house alone at least once that evening.[2] When Camacho came alone, he drove his white Dodge Ram Charger. He talked to Martinez and left. Servando Martinez, Martinez's brother, testified, "I heard . . . that [Camacho] was there to charge my brother for kilo of cocaine." Investigator Santiago Manrique confirmed that his investigation indicated Camacho was holding Martinez responsible for a "kilo" of cocaine.

Camacho arrived with appellant in a Mitsubishi GT-3000. Lara, at whose house Martinez and the others gathered, recounted Martinez greeting the two men near the driveway. Lara testified that Camacho hit Martinez in the face with a gun and "[t]hey forced [Martinez] towards the street." Servando explained that the men got on either side of Martinez. Appellant "hugged"[3] Martinez, and Camacho hit Martinez with a gun, causing Martinez to bleed. Lara described how appellant and Camacho then pushed and pulled Martinez towards the GT-3000 and tried to force Martinez into the car.

Renalto Garcia Jr., who was also present at Lara's house, testified that he was very intoxicated that evening, and he did not clearly recall many details. He remembered Camacho hitting Martinez in the head with a gun and both men trying to force Martinez into a small car, but clarified that he did not "recall the other guy touching" Martinez. Garcia remembered that one of the men pointed a gun at him and the other bystanders

---

[2] Servando Martinez testified that Camacho came once before returning with the young man. Renalto Garcia Jr. said Camacho came to the house a total of three times, and Francisco Lara claimed Camacho came four times.

[3] It should be noted that Servando testified through an interpreter. He later clarified that it was not a hug, and he demonstrated to the court appellant's alleged conduct at the moment Camacho hit Martinez in the face with a gun.

and "kept them at bay." He testified that he could not remember which man pointed the gun, but then stated that it was the "big guy" (Camacho).[4]

Servando testified that appellant, not Camacho, pointed the gun at him and the others; Servando explained that appellant picked up the gun, Martinez's .380-caliber pistol, after Camacho ordered Martinez to toss it aside. "He pointed the gun and he told me to go back, and he told me it wasn't just anything that he, that your brother took." Servando testified that appellant, while pointing a gun at them, took Lara's cordless house phone and Servando's keys. Lara said appellant pointed Martinez's pistol at him and demanded, "Give me the damn phone."

Servando recounted that Martinez resisted entering the GT-3000 and asked to take his black Mitsubishi Montero instead. Camacho forced Martinez into the Montero, and they left in the Montero at the same time appellant left in the GT-3000. Servando said the Montero went toward one street and the GT-3000 toward another; Lara testified that appellant turned his car around and followed Martinez and Camacho. Minutes later, Lara allegedly heard gunshots in the distance.

Montelongo testified that after she heard the gunshots outside her house, she heard three voices nearby. One voice said "I'm going to kill you," and another voice said "'We're going to kill you. We're going to kill you.'" Montelongo then heard the victim's pained voice. Montelongo next heard vehicle doors closing and a vehicle leave. She testified that she did not look outside, but upon reviewing her previously-given statement, she noted she had looked out the window and seen "[a] white vehicle, a white truck."

---

[4] Garcia previously described Camacho as a "tall, big guy."

4

Later that morning, the police officers found the GT-3000 abandoned in the government-housing parking lot near where Martinez died. The officers observed blood spatter on the back of the vehicle. They searched the vehicle and found .45 caliber bullets in the center console and a pin pusher[5] in the glove box.[6] Alejandro Madrigal Jr. from the Texas Department of Public Safety Crime Laboratories testified as a DNA expert. Madrigal testified about several swabs that were taken from the exterior of the GT-3000. He concluded that "[t]o a reasonable degree of scientific certainty, the victim [Martinez] is the source for this DNA profile" from two locations on the GT-3000.[7]

Appellant testified that he barely knew Camacho. Appellant said that he met Camacho at appellant's twentieth birthday party after appellant's brother-in-law borrowed Camacho's grill for the party. Other than returning Camacho's grill, appellant denied any further contact with Camacho until October 23, 1999.

Appellant testified that he contacted Camacho on October 23 and offered to sell him the GT-3000 because Camacho bought and sold cars. Later that night, appellant visited a friend, Tony, at Tony's house and drank beer with friends. Camacho arrived, approached appellant, and asked appellant to give him a ride "to a friend of his that I didn't know . . . ." Appellant summarized, "[Camacho] just suddenly arrived. He just got there, and he got there by walking." When asked how Camacho knew appellant was at Tony's house, appellant speculated that Camacho had seen the GT-3000 parked on the street

---

[5] Detective Wayne Infante of the Brownsville Police Department explained that a pin pusher is a tool used to push a firearm's firing pin into place.

[6] Detective Infante did not know where in the GT-3000 the pin pusher was found, but Investigator Ray Pineda of the Brownsville Police Department later testified it was found in the vehicle's glove box.

[7] Madrigal explained that the other swabs yielded no interpretable results, no recordable results, or no DNA profile.

outside the house. Appellant acknowledged that he had not yet shown Camacho the GT-3000, but appellant noted that the GT-3000 is "not a very common car."

According to appellant, he gave Camacho a ride so Camacho could appraise the vehicle; appellant stated that they were negotiating prices for the vehicle while he drove. Appellant denied knowing Camacho was armed and claimed he never saw a pin pusher. Appellant denied helping or intending to help Camacho in kidnapping or killing Martinez and denied touching Martinez or threatening anyone. Appellant disclaimed any knowledge of a drug deal between Camacho and Martinez.

Appellant affirmed that he and Camacho arrived at the house and approached it on foot. Martinez came out to meet Camacho. Camacho and Martinez began talking and walking back toward the GT-3000. Appellant thought their tone was normal. Appellant said he and the other two men were going to leave in the GT-3000, so appellant held the driver's door open for them. Appellant testified that a third person then grabbed him, pushed him against the car, put a gun in his face, and said, "My brother! They're not going to take my brother!" Appellant claimed Camacho produced a pistol and hit the third person with it, allowing appellant to grab the third person's gun and a cordless phone, which the person held in his other hand. Appellant threw the firearm and the phone into a nearby lot while Camacho hit Martinez in the face with Camacho's pistol. Camacho saw a pistol in Martinez's waistband, grabbed it, and threw it at appellant's feet. Appellant said he grabbed the gun, got in the GT-3000, and left.

Appellant testified that while stopped at a traffic light, he released the pistol's magazine, threw the gun out of his window, took the bullets out of the magazine, and

6

tossed the magazine out of the window. Appellant then returned to Tony's house, but parked at a government-housing parking lot, which was about one block away, because he feared the "people that were fighting with guns" might "come and get me." He testified that the music at Tony's house "was really loud" but that he and the other guests soon heard gunshots. At that point, appellant got a ride to his sister's house, which was a "considerable . . . distance" from Tony's house. He never returned to the GT-3000.

Appellant related that later that morning, he took a Greyhound bus to Houston. He testified his mother informed him that the police were looking for him and that if they caught him that they would "give me the needle." So, appellant relocated to Mexico, where he lived until he was arrested and brought back to the United States some thirteen years later.

## II. SUFFICIENCY OF THE EVIDENCE

By his second issue, appellant argues the evidence is legally insufficient to support a conviction for capital murder or the implied finding of kidnapping. We disagree.

### A. Standard of Review

"The standard for determining whether the evidence is legally sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Johnson v. State*, 364 S.W.3d 292, 293–94 (Tex. Crim. App. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original); *see Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.). "The jury is the exclusive judge of the credibility of the witnesses and of the weight to be

given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence." *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) (en banc) (citing *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996)).

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

A person commits capital murder by intentionally or knowingly causing the death of an individual in the course of committing or attempting to commit kidnapping. TEX. PENAL CODE ANN. § 19.03(a)(2) (West 2011); *see id.* § 19.02(b)(1) (West 2011) (establishing murder elements incorporated by section 19.03(a)). Kidnapping is the intentional or knowing abduction of another person. *Id.* § 20.03(a) (West 2011). A person acts intentionally when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a) (West 2011). A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. *Id.* § 6.03(b) (West 2011). A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits,

8

encourages, directs, aids, or attempts to aid the other person to commit the offense.  *Id.* § 7.02(a)(2) (West 2011).

**B.   Analysis**

Appellant's sufficiency challenge presumes his version of events is correct and disregards much of the State's witnesses' testimony.  Appellant discredits the three witnesses who were at Lara's house, arguing that they were drunk on the night in question, and repeatedly challenges Montelongo's testimony as heavily impeached and lacking in credibility.  We defer to the jury as the exclusive judge of the credibility of the witnesses and of the weight to be given their testimony; we further defer to the jury's role in reconciling conflicts in the evidence.  *See Wesbrook*, 29 S.W.3d at 111.  The jury was entitled to believe the State's witnesses and disbelieve appellant's testimony.  *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008).

Servando's and Lara's testimony portrayed appellant as actively helping Camacho kidnap Martinez.  They testified that appellant assisted Camacho in forcing Martinez toward the GT-3000, pointing a handgun at them, and taking Lara's phone, which hampered their immediate ability to call 911.  Servando stated that appellant remarked, "[I]t wasn't just anything . . . that your brother took."  Viewing the evidence in the light most favorable to the prosecution, *Johnson*, 364 S.W.3d at 293–94, we hold a rational trier of fact could have found appellant assisted or attempted to assist Camacho in kidnapping Martinez.  *See* TEX. PENAL CODE ANN. § 7.02(a)(2).

The evidence connecting appellant to the murder included:  a pin pusher and some .45 caliber bullets found in the GT-3000; Martinez's DNA on the GT-3000; Lara's

9

testimony that appellant, in the GT-3000, followed Camacho and Martinez when they left in Martinez's Montero; Lara's testimony that he heard gunshots a few minutes after appellant, Camacho, and Martinez left in the same direction; Montelongo's testimony that she heard three voices, two of which expressed threats and one of which appeared to be the victim's voice; Montelongo's testimony that she heard more than one vehicle door closing after the shooting; and the fact that the police found the GT-3000 not far from where Martinez was killed. Although appellant gave an alternative explanation for the presence of some of the evidence, the jury was free to disbelieve his testimony. *See Lancon*, 253 S.W.3d at 707. For example, appellant claimed the .45-caliber bullets came from Martinez's gun, which appellant allegedly unloaded at a stoplight while escaping from an unexpected altercation. Servando, however, testified that Martinez owned a .380-caliber gun.

The jury was free to disbelieve appellant's explanation that the police informed his mother that they planned to give him "the needle," and instead infer appellant's flight suggested guilt. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) ("We have recognized that a factfinder may draw an inference of guilt from the circumstance of flight."). "A 'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt." *Hyde v. State*, 846 S.W.2d 503, 505 (Tex. App.—Corpus Christi 1993, pet. ref'd) (quoting *Torres v. State*, 794 S.W.2d 596, 598–600 (Tex. App.—Austin 1990, no pet.)). "It is consequently a well accepted principle that any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt' may be received as a circumstance tending to prove that he

committed the act with which he is charged." *Torres*, 794 S.W.2d at 598 (quotations omitted). Here, appellant's flight from Texas and the United States and his use of false names in Mexico support an inference that appellant sought to evade arrest because he was guilty of the charged offense. *See Yost v. State*, 222 S.W.3d 865, 875 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd); *see also Matthews v. State*, Nos. 13-12-00051-CR, 13-12-00052-CR, 13-12-000560-CR, 2013 WL 3894005, at *18 (Tex. App.—Corpus Christi July 25, 2013, no pet.) (mem. op., not designated for publication).

Appellant argues "that the evidence of intent on the part of [appellant] to murder Rey Martinez is extraordinarily tenuous." The State has the burden of proving appellant possessed intent or knowledge to kill, but direct evidence of intent or knowledge is not necessary; a jury may infer intent or knowledge from a defendant's acts, words, conduct, and the method of committing the crime and the nature of the wounds inflicted on the victim. *See Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (en banc) (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999)); *Linden v. State*, 347 S.W.3d 819, 822 (Tex. App.—Corpus Christi 2011, pet. ref'd). After reviewing the evidence, we hold a rational jury could have inferred appellant intentionally or knowingly killed or aided or attempted to aid Camacho in killing Martinez. *See* TEX. PENAL CODE ANN. § 7.02(a)(2); *Hart*, 89 S.W.3d at 64.

We conclude that a rational jury could have found the essential elements of capital murder committed during the course of a kidnapping beyond a reasonable doubt. *See Johnson*, 364 S.W.3d at 293–94. We overrule appellant's second issue.

11

### III. JURY'S SENSE OF RESPONSIBILITY

By his first issue, appellant argues that his conviction must be reversed because the trial court misled the jury during its pretrial comments regarding whether there would be a punishment phase where the jury could exercise its discretion in determining the severity of punishment. Appellant relatedly contends that the trial court erred in refusing to submit two requested jury instructions that would have informed the jury that a guilty verdict on capital murder would automatically result in life imprisonment. Appellant further contends that the State and trial court misled the jury with improper comments during appellant's closing argument.

Appellant's first issue is multifarious and therefore subject to being overruled. *See Smith v. State*, 316 S.W.3d 688, 694 (Tex. App.—Fort Worth 2010, pet. ref'd). A multifarious issue is one that embraces more than one specific ground. *Id.* (citing *Stults v. State*, 23 S.W.3d 198, 205 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd)). Nevertheless, in the interest of justice, appellate courts may address a multifarious issue that is sufficiently developed in the brief. *Id.* (citing *Foster v. State*, 101 S.W.3d 490, 499 (Tex. App.—Houston [1st Dist.] 2002, no pet.)). Because we are able to discern appellant's contentions, we will address appellant's issues. *See id.* (citing *Newby v. State*, 169 S.W.3d 413, 414 (Tex. App.—Texarkana 2005, pet. ref'd)).

### A. Trial Court's Pretrial Comment

Appellant complains that the following pretrial comment made by the trial court allegedly caused the misinformation:

If you're not part of the actual guilt/innocence, you're not part of the sentencing; all right? The actual twelve that did the guilt/innocence have to do the punishment . . . .

Appellant notes that because the State did not seek the death penalty and the jury convicted him for capital murder, he was automatically sentenced to life imprisonment without a separate punishment phase. *See* TEX. CRIM. PROC. CODE ANN. art. 37.071, § 1 (West Supp. 1995).[8] Appellant claims that the trial court thereby misled the jury and diminished its sense of responsibility.

The trial court made the complained-of statement after the jury was empanelled and sworn but before the guilt/innocence phase began. In context, the trial court was discussing the alternate jurors' role. Immediately preceding the extracted statement, the trial court informed the alternate jurors that the court would excuse them when the jury began deliberations. The comment was a response to one of the alternate juror's questions: "Would that [excusing the alternate jurors at commencement of deliberations] also carry over into the sentencing, if someone gets to that point?" The court's full statement in response was:

No. No. If you're not part of the actual guilt/innocence, you're not part of the sentencing; all right? The actual twelve that did the guilt/innocence have to do the punishment, and that's why I'm saying that you will—once they start deliberating and I tell them, "Okay, you've heard everything. You're going to go deliberate," and they get in there and they pick their foreman and they begin deliberating, I will then excuse you two.

Viewed in context, the statement was not misleading; it accurately explained the procedure relating to excusing alternate jurors. Although the jury subsequently convicted appellant of capital murder, the conviction on that count was not a foregone

---

[8] We cite to the statute under which appellant was sentenced because the statute has since changed. *See infra* note10.

13

conclusion when the trial court made the statement.   The State charged appellant with two counts; one was capital murder, but the other was kidnapping.   Even assuming the statement implied there would be a punishment phase, the statement would not have been misleading because a punishment phase was not foreclosed for a non-capital murder conviction.

Regardless, we do not read the statement to imply the inevitability of a punishment phase.   The statement hardly parallels the statements discussed in *Caldwell v. Mississippi*, 472 U.S. 341 (1985), a case on which appellant relies.[9]   In *Caldwell*, the prosecutor informed the jury, during jury argument and in response to the defense attorney's argument on the gravity of sentencing the defendant to death, that their verdict was automatically reviewable.   472 U.S. at 325–26.   The prosecutor failed to mention that the state's appellate courts applied a presumption of correctness in reviewing a jury's sentence.   *See id.* at 331.   The Supreme Court concluded "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."   *Id.* at 328–29.   Here, the trial court accurately responded to an alternate juror's question asking whether alternate jurors would need to be available for punishment "if someone gets to that point?"   Additionally, the court's statement was much less indicative of a impending punishment phase as the comment made by appellant's attorney at voir dire:   "[I]f . . . found guilty, the jury will be making a decision on punishment."   We overrule appellant's sub-issue.

---

[9]   Appellant also cites *Ramano v. Oklahoma*, but only for the general, well-established principle that the jury must not be misled regarding its role in sentencing.   *See* 512 U.S. 1, 8 (1994).

**B.      Denial of Appellant's Requested Jury Instructions**

During the jury charge conference, appellant objected to the jury charge and requested the addition of an instruction to the verdict form informing the jury that a finding of guilt would automatically result in life imprisonment.   In the alternative, appellant asked the court to include the instruction in the jury charge.   The trial court denied appellant's requests.

We review the trial court's decision on both requests together.   *See Jennings v. State*, 302 S.W.3d 306, 310 (Tex. Crim. App. 2010) (noting verdict forms become part of a jury charge).   When presented with an argument that a trial court committed jury charge error, we conduct a two-step inquiry:   "First, the reviewing court must determine whether the jury charge contains error.   Second, the court must determine whether sufficient harm resulted from the error to require reversal."   *Mann v. State*, 964 S.W.2d 639, 641 (Tex. Crim. App. 1998) (en banc); *see Benn v. State*, 110 S.W.3d 645, 648 (Tex. App.—Corpus Christi 2003, no pet.).

Appellant characterizes the trial court's denial as a failure to "cure" the trial court's "deception" of the jury by implying there would be a punishment phase.   Appellant does not otherwise contend the jury charge failed to reflect applicable law.   As discussed, we do not agree that the trial court's statement in response to an alternate juror's question about excusal misled the jury.   We therefore see no need for the trial court to have corrected it.   Appellant cites no authority, and we find none, requiring a trial court to inform a jury, either in a charge or verdict form, of the gravity of punishment correspondent with a guilty verdict.   On the contrary, "[t]he court properly reserved the

15

punishment issues for the punishment stage, as is required under the express terms of [Texas Code of Criminal Procedure] Article 37.071 . . . ." *Morales v. State*, 571 S.W.2d 3, 4 (Tex. Crim. App. 1978) (en banc); *see Staggs v. State*, 503 S.W.2d 587, 588 (Tex. Crim. App. 1974) ("[I]nformation regarding punishment in the charge at the guilt-innocence stage is improper . . . ."); *see also Cook v. State*, 488 S.W.2d 822, 823 (Tex. Crim. App. 1972) ("[T]he court . . . should not instruct the jury on the penalty to be assessed in the charge submitted to the jury following the guilt or innocence stage of the trial."); *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.).   We hold that the jury charge was not erroneous for not including appellant's requested instructions.

## C.     Trial Court's Comment During Closing Argument

Appellant argues that the comments made by the State and the trial court in the following excerpt further misled the jury regarding its punishment role:

| | |
|---|---|
| [Defense]: | On the first question, if the answer is yes, there is no jury consideration— |
| [State]: | And I'm going to object to this being improper argument at this stage. |
| THE COURT: | It will be overruled. |
| [Defense]: | There is no consideration by the jury or anyone of what the proper punishment is.  It's life; okay?  "Yes" to number one, guilty to number one, and it's life. |
| | The others, we talked on voir dire about the range of punishment and what it would be. |
| THE COURT: | All right.   Ladies and Gentlemen, I am going to instruct you, however, that at this stage you are not to consider punishment, just the guilt/innocence; all right? |

16

Appellant did not object to the court's comment, perhaps because the trial court had already informed him that it would make the statement if appellant mentioned mandatory life imprisonment during closing argument. At the jury charge conference, appellant asked to discuss the fact that a guilty verdict would result in a mandatory life sentence. The State objected, noting that voir dire was the proper time to consider whether the jury could apply the full range of punishment. The trial court noted the State's objection, and it informed appellant that he could make the comment, "[y]ou [the State] can object, and then what I'll do is, I'll tell them, 'Ladies and Gentlemen, you're not to consider punishment at this time.'" Appellant did not object to the trial court's proposal.

"Trial courts have significant discretion to control the arguments offered on a party's behalf, and a trial court's rulings controlling argument are subject to reversal only when that discretion is abused." *Gloede v. State*, 328 S.W.3d 668, 673 (Tex. App.—Beaumont 2010, no pet.) (citing *Hall v. State*, 126 S.W. 573, 573 (1910)). As a general rule, punishment should not be discussed by either side at the guilt-innocence phase of the trial because the issue during that phase is the defendant's guilt, not the effect of the conviction. *Garcia v. State*, 887 S.W.2d 862, 877 (Tex. Crim. App. 1994) (en banc), *overruled on other grounds*, *Hammock v. State*, 46 S.W.3d 889, 893 (Tex. Crim. App. 2001); *McClure v. State*, 544 S.W.2d 390, 393 (Tex. Crim. App. 1976); *see Haynes v. State*, 05-03-01092-CR, 2004 WL 1173403, at *2 (Tex. App.—Dallas May 27, 2004, no pet.) (not designated for publication). Allowing discussion of punishment during the guilt-innocence phase serves as an invitation to the jury to consider the effect of conviction rather than the facts themselves in determining the defendant's guilt.

17

*McClure*, 544 S.W.2d at 393; *Bruton v. State*, 921 S.W.2d 531, 536 (Tex. App.—Fort Worth 1996, pet. re'fd); *see Freeman v. State*, 985 S.W.2d 588, 589 (Tex. App.—Beaumont 1999, pet. ref'd).  Moreover, discussion of punishment does not fall into one of the four permissible areas of jury argument:   (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answers to the argument of opposing counsel; and (4) pleas for law enforcement.   *See Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011); *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). Accordingly, the trial court would not have abused its discretion by disallowing appellant any discussion of punishment, and it did not abuse its discretion by allowing appellant to mention it subject to the trial court's advisement that it was not part of the jury's guilt/innocence calculus.   *See Gloede*, 328 S.W.3d at 673.

In conclusion, we overrule appellant's first issue.

## IV.   TEXAS CODE OF CRIMINAL PROCEDURE ARTICLE 37.071

Appellant's third issue is that article 37.071 section 1 of the Texas Code of Criminal Procedure is unconstitutional under *Miller v. Alabama*, 132 S. Ct. 2455 (2012).   Because appellant did not challenge the constitutionality of article 37.071 in the trial court, we focus our review on whether *Miller*, which was decided after appellant's trial, somehow invalidates the statute.   *See Turner v. State*, No. 01-11-00839-CR, 2013 WL 4520897, at *7 (Tex. App.—Houston [1st Dist.] Aug. 27, 2013, no pet. h.) (applying *Miller* in review of pre-*Miller* trial).

### A.   Standard of Review

The constitutionality of a criminal statute is a question of law which we review de novo.   *Owens v. State*, 19 S.W.3d 480, 483 (Tex. App.—Amarillo

18

> 2000, no pet.); *State v. Salinas*, 982 S.W.2d 9, 10–11 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd). When reviewing the constitutionality of a statute, we presume the statute is valid and the legislature has not acted unreasonably or arbitrarily in enacting the statute. *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002); *Ex parte Granviel*, 561 S.W.2d 503, 511 (Tex. Crim. App. 1978). The burden rests on the party challenging the statute to establish its unconstitutionality. *Rodriguez*, 93 S.W.3d at 69. We are obligated to uphold a statute if we determine a reasonable construction which will render it constitutional. *See Ely v. State*, 582 S.W.2d 416, 419 (Tex. Crim. App. 1979).

*Render v. State*, 316 S.W.3d 846, 856 (Tex. App.—Dallas 2010, pet. ref'd); *see McMillian v. State*, 388 S.W.3d 866, 870–71 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Lawson v. State*, 283 S.W.3d 438, 440 (Tex. App.—Fort Worth 2009, pet. ref'd).

## B.    Analysis

*Miller* established that mandatory life imprisonment without parole of a juvenile violates the Eighth Amendment. *See* 132 S.Ct. at 2460, 2469. *Miller* did not invalidate life imprisonment for adults, whatever their age; the Supreme Court premised its holding on the distinction between juveniles and adults. *See id.* at 2463–469. *Miller* left intact, excepting juveniles, the Supreme Court's prior holding in *Harmelin v. Michigan*, which stated in relevant part: "Petitioner asks us to extend this so-called 'individualized capital sentencing doctrine' . . . to an 'individualized mandatory life in prison without parole sentencing doctrine.' We refuse to do so." 501 U.S. 957, 995 (1991). In distinguishing *Harmelin*, the *Miller* court explained:

> *Harmelin* had nothing to do with children and did not purport to apply its holding to the sentencing of juvenile offenders. We have now held on multiple occasions that a sentencing rule permissible for adults may not be so for children. Capital punishment, our decisions hold, generally comports with the Eighth Amendment—except it cannot be imposed on children. . . . So too, life without parole is permissible for nonhomicide offenses—except, once again, for children.

19

132 S.Ct. at 2470.

Appellant was twenty at the time of Martinez's killing; he was not a juvenile. *See* TEX. FAM. CODE ANN. § 51.02(2) (West 2008). His case falls under *Harmelin*, not *Miller*. Appellant nevertheless asks us to extend *Miller* to an area explicitly excluded in *Miller*. We decline the invitation. Moreover, appellant's requested application would extend the Surpeme Court's caution regarding life imprisonment without the possibility of parole to a case in which appellant is eligible for parole. *See* TEX. CRIM. PROC. CODE ANN. art. 37.071, § 1 (West Supp. 1995).[10] We overrule appellant's third issue.

## V. PROPRIETY OF PROSECUTOR'S CROSS-EXAMINATION QUESTION

By his fourth issue, appellant asserts his conviction must be reversed because the prosecutor engaged in misconduct by asking appellant whether he held a position in the Mexican drug cartel. Appellant contends that there was no evidence appellant held such a position and that the question was calculated to inflame the jurors' minds.

Appellant did not object to the question at trial. Appellant thus failed to preserve the issue for review. *See* TEX. R. APP. P. 33.1; *Penry v. State*, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995) (holding that to preserve complaint of prosecutorial misconduct, appellant must (1) object on specific grounds; (2) request an instruction that the jury disregard the comment; and (3) move for mistrial); *Wilson v. State*, 819 S.W.2d 662, 664 (Tex. App.—Corpus Christi 1991, pet. ref'd) (same). Appellant acknowledges he did not preserve error, but he relies on the preservation exception established in *Rogers v. State*,

---

[10] The law in existence at the time of appellant's conduct, unlike today, allowed for the possibility of parole when a defendant was convicted of a capital felony but the State did not seek the death penalty.

20

a case in which our sister court concluded that a prosecutor's unobjected-to but pervasive misconduct warranted reversal. *See* 725 S.W.2d 350, 358–61 (Tex. App.—Houston [1st Dist.] 1987, no pet.).

The misconduct covered in *Rogers* was ubiquitous in the trial, and the appellate court concluded, "Though the appellant failed to properly preserve many errors resulting from the prosecutor's misconduct, the facts of the present case, in which *impermissible prejudice permeates the entire record*, indicate that even frequent instructions to disregard would not have sufficed to remove the prejudice." *Id.* at 360–61 (emphasis in original). Appellant reasons that the challenged question was of such "nuclear nature" that it, like the misconduct in *Rogers*, vitiated fundamental fairness and was clearly calculated to inflame the jurors' minds.

"Generally, the mere asking of an improper question will not constitute reversible error." *Wilson*, 819 S.W.2d at 664. We nevertheless do not discount the possibility that "[*i*]*n extreme cases*," a single question, "when obviously harmful to the defendant" or lacking evidentiary foundation and clearly calculated to inflame the jurors' minds, may be reversible. *See id.* (emphasis in original). The kind of question that is exempt from preservation requirements is "of such character that it is practically impossible to withdraw the impression produced in the minds of the jurors . . . ." *Id.*; *see Rogers*, 725 S.W.2d at 360–61 ("[I]nstructions to disregard would not have sufficed to remove the prejudice.").

Even assuming the question was improper, it does not rise to the level of prejudice contemplated by *Rogers*. *See* 725 S.W.2d at 351–58, 360–61. We are not persuaded the question was unfounded: witnesses testified that underlying Martinez's murder was

21

a botched drug transaction in which Martinez provided someone a substantial amount of cocaine on credit and Camacho expected Martinez to pay for the cocaine, that appellant explained Martinez's abduction by telling Martinez's family and friends, while pointing a gun at them, "[I]t wasn't just anything . . . that your brother took," and that both appellant and Camacho fled to Mexico after Martinez was killed. Neither are we convinced that an instruction to disregard would have been insufficient to cure any impression produced in the jurors' minds. *See Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999) (holding that in most cases, an instruction to disregard will cure harm caused by an improper question).

We overrule appellant's fourth issue as unpreserved. *See* TEX. R. APP. P. 33.1; *cf. Rogers*, 725 S.W.2d at 351–58, 360–61.

## VI. RULING ON TRIAL OBJECTION

Appellant asserts in his fifth issue that the judgment must be reversed because the trial court, after instructing the defense to refrain from presenting testimony about appellant's activities in Mexico after Martinez's murder, allowed the State to elicit testimony, over appellant's objection, that appellant used false names during that time.

The limitation on the defense that appellant alludes to is reflected in the trial court's pretrial instruction that the defense not present character evidence of appellant's truthful character while he was in Mexico. In context, the trial court and the defense attorney were discussing whether the defense could solicit character evidence absent any impeachment by the State. The trial court explained that such evidence would be bolstering and irrelevant to appellant's character at the time he committed the offense.

22

Nevertheless, defense counsel remarked, "[A]ssuming we still decide to call him [a character witness], we'll wait and call him and you can see what issues are raised, and then we'll address you before we call him, anyway." The court agreed: "Okay. That's fine. We'll do it like that. We'll do it like a limine." Defense counsel then requested, "If you'd just give us an opportunity, if you exclude him, to go ahead and make a bill." The trial court responded that it would.

The following excerpt contains the trial court's ruling that appellant challenges on appeal:

| [State]: | And in the last twelve years, have you had to use a false name? |
| [Defense]: | Your Honor, we'll object to the relevance on this. We've been excluded from discussing the last twelve years. We think it should apply to the State. |
| THE COURT: | Overruled. |

Appellant neither presented a witness to testify on appellant's character for truthfulness nor filed a bill of exception.

On appeal, appellant claims the prejudicial effect of the fact that appellant used false identities greatly outweighed the probative value. *See* TEX. R. EVID. 403. The State claims appellant failed to preserve that ground for appellate review. We agree with the State. To preserve error, an appellant must submit a timely objection into the trial-court record. *See* TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a)(1). The error alleged on appeal must comport with the objection submitted to the trial court. *See* TEX. R. APP. P. 33.1(a); *Heidelberg v. State,* 144 S.W.3d 535, 537 (Tex. Crim. App. 2004) ("The legal basis of a complaint raised on appeal cannot vary from that raised at trial").

23

At trial, appellant objected on grounds that the solicited testimony was irrelevant, *see* TEX. R. EVID. 401, not that its prejudicial effect greatly outweighed the probative value.

In his reply brief, appellant contends that his trial objection implicated rule 403 because defense counsel referenced the pretrial "oral order in limine" in the objection. Appellant asserts that motions in limine serve only to exclude prejudicial evidence, and thus appellant's objection covered relevance and rule 403. We disagree. The pretrial discussion makes clear that the trial court proscribed appellant's use of character evidence absent impeachment by the State because it would be irrelevant. The court did not discuss a rule 403 balancing test. *See* TEX. R. EVID. 403. At defense counsel's insistence on presenting the character witness, the court agreed to treat the matter "like a limine" and allow defense counsel to consult the court before presenting the witness. The record reflects that appellant neither presented nor requested to present the character witness. In reviewing appellant's articulated objection at trial, we conclude he did not apprise the trial court of the rule 403 complaint presented on appeal.

We overrule appellant's fifth issue as unpreserved. *See* TEX. R. APP. P. 33.1; *Heidelberg,* 144 S.W.3d at 537.

## VII.   RULING ON OBJECTION DURING CLOSING ARGUMENT

By his sixth issue, appellant argues the judgment must be reversed because the trial court erroneously overruled an objection to the State's final jury argument that grossly understated the State's burden of proof. The following excerpt is the relevant portion of the record:

[State]:                There are a lot of things that the defendant said, and I
                        will say at this point that in this case, the defendant has

given you a theory, a detailed theory. So this is not a matter of you saying, well, you know, looking at the elements, and what do I think? He's given you a theory that you need to believe in order for you to believe that he did not commit this crime.

[Defense]: I'll object to that. That's a misstatement of the law, Your Honor.

THE COURT: Ladies and Gentlemen, you will get the law from the jury instruction that I have given you. Thank you.

[State]: He has given you his side of the story.

[Defense]: Let me further object that it—or request that the jury failed to comply with *In* [*r*]*e*[] *Winship* requiring that every element of the offense be proved beyond a reasonable doubt.

THE COURT: All right. Ladies and Gentlemen, you are instructed that the state has the burden of proving each and every element of the allegations in the indictment beyond a reasonable doubt.

[Defense]: Is that overruled, Your Honor?

THE COURT: That will be overruled.

[State]: And the state does still have the same burden of proving all the elements beyond a reasonable doubt, but in this case, the defendant's given you a story, and you're going to have to choose whether or not you believe that story. There's two versions of the story.

[Defense]: I renew my—

[State]: You can believe the state's version or you can believe the defendant's version.

[Defense]: I renew my objection, Your Honor. The state still has the burden of proof, whether or not I have on opening statement given the theory of what happened. They continue with that burden of proof, and this argument is contrary to that.

25

THE COURT:     That will be overruled.

## A.    Standard of Review and Applicable Law

We review a trial court's ruling on an objection for improper jury argument for abuse of discretion.   *See Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004); *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001).   Proper jury argument generally falls within one of four areas:   (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answers to the argument of opposing counsel; and (4) pleas for law enforcement.   *Freeman*, 340 S.W.3d at 727; *Brown*, 270 S.W.3d at 570. In examining challenges to a jury argument, we consider the remark in the context in which it appears.   *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988); *Gonzalez v. State*, 115 S.W.3d 278, 284 (Tex. App.—Corpus Christi 2003, pet. ref'd).

It is the State's burden to prove each element of the offense beyond a reasonable doubt.   *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012).   "The law on burden of proof is constitutional:   The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that every state criminal conviction be supported by evidence that a rational factfinder could find as sufficient to prove all the elements of the offense beyond a reasonable doubt."   *Abbott v. State*, 196 S.W.3d 334, 344 (Tex. App.—Waco 2006, pet. denied) (citing *In re Winship*, 397 U.S. 358, 362–64; *Coit v. State*, 808 S.W.2d 473, 475 (Tex. Crim. App. 1991)); *see Sotelo v. State*, No. 13-09-00024-CR, 2009 WL 4695387, at *3 (Tex. App.—Corpus Christi Dec. 10, 2009, no pet.) (mem. op., not designated for publication).   It is therefore constitutional error for the State to understate its burden.   *See Abbott*, 196 S.W.3d at 344; *see also Sotelo*, 2009

26

WL 4695387, at *3. If an appellate court finds constitutional error, it must reverse the conviction unless it determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a); *Abbott*, 196 S.W.3d at 344; *Sotelo*, 2009 WL 4695387, at *3.

**B.    Analysis**

In essence, the State's argument asked the jury to decide whether the State or the appellant was more believable. Although credibility is important, the standard for criminal conviction is not which side is more believable, which basically describes a preponderance of the evidence standard. *See Allen v. State*, 841 S.W.2d 7, 11 (Tex. Crim. App. 1992) (en banc) ("By definition, preponderance of the evidence means the greater weight of credible testimony.") (citations omitted); *see also Hulbert v. State*, No. 13-02-00110-CR, 2003 WL 21981934, at *1 (Tex. App.—Corpus Christi Aug. 21, 2003, no pet.) (not designated for publication) (stating same). The State's burden is proof beyond a reasonable doubt. *Merritt*, 368 S.W.3d at 525. It is imaginable that a jury could find a particular defendant is being dishonest but the State nevertheless failed to meet its burden.

The State defends the jury argument as a reasonable deduction from the evidence and a response to appellant's argument that challenged the credibility of the State's witnesses. *See Freeman*, 340 S.W.3d at 727; *Brown*, 270 S.W.3d at 570. That may be true, but it does not allow the State to misstate the law. *See Abbott*, 196 S.W.3d at 343 (citing *Withing v. State*, 797 S.W.2d 45, 48 (Tex. Crim. App. 1990) (en banc)) ("But even when answering opposing counsel or making a plea for law enforcement, a prosecutor

27

cannot misstate the law."). We hold that the State's argument was error for misstating its burden to prove the elements of the offense beyond a reasonable doubt. *See Merritt*, 368 S.W.3d at 525; *Abbott*, 196 S.W.3d at 343; *cf. Gore v. State*, 719 So. 2d 1197, 1200 (Fla. 1998) (holding that the following prosecutor's argument misstated the burden of proof and was error: "It's simple and it comes down to this in simplicity: If you believe his story, he's not guilty. If you believe he's lying to you, he's guilty. It's that simple.").

## C.    Harm Analysis

Having found error, we must reverse the conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a). In our review, we do not focus on the propriety of the trial's outcome; instead, we should try to calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000) (en banc). In reaching this decision, we consider the following factors: the nature of the error, the extent it was emphasized by the State, its probable collateral implications, and the weight a juror would probably have placed on the error. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011). These factors are not exclusive, and not every factor will necessarily apply. *Id.* "[A]n analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Id.* (quoting TEX. R. APP. P. 44.2(a)).

28

In finding error, we already touched on the implication of the State's comments. Appellant objected three times to the State's invitation for the jury to choose a side, but, because appellant's objections appear to interrupt the State's thought, the invitation seems to have been extended only twice; once before objection and once after the trial court overruled the objection. Regardless, the State was able to repeat the error, emphasizing it to some extent. The State even characterized its argument as consistent with its burden of proof. These observations lend some support to a finding of harm.

On the other hand, although the trial court overruled appellant's objection, it immediately instructed the jury to consult the jury charge for the controlling statement of the law. The jury charge contained the correct burden of proof. We presume the jury followed the jury charge absent evidence to the contrary, which appellant has not provided. *See Taylor v. State*, 332 S.W.3d 483, 492 (Tex. Crim. App. 2011); *Wesbrook*, 29 S.W.2d at 116. When appellant again objected, the trial court told the jury, "Ladies and Gentlemen, you are instructed that the state has the burden of proving each and every element of the allegations in the indictment beyond a reasonable doubt." Thus, both in the context of the improper comment as well as in the charge, the trial court instructed the jury regarding the proper burden of proof. These observations suggest that the jury likely placed little weight on the misstatement.

As an additional consideration, as in *Snowden*, "the evidence against appellant was substantial, if not overwhelming." *See Snowden*, 353 S.W.3d at 825. We discussed the strength of the evidence at length in the section addressing the evidentiary sufficiency to convict. Incorporating that discussion here, we are further "persuaded to a

29

level of confidence beyond a reasonable doubt" that the State's fleeting misstatement during jury argument "made no contribution to the jury's determination that the appellant was guilty . . . ." *See id.*

We overrule appellant's sixth issue.   *See* TEX. R. APP. P. 44.2(a).

## VIII.   CUMULATIVE ERROR

By his seventh issue, appellant argues the cumulative impact of the errors alleged in his first six issues is so great that reversal is required.   We need not decide this issue, however, because appellant's conclusory statement that the "cumulative effect of all [his alleged errors] warrants reversal" is insufficient to maintain his burden to adequately brief the point of error.   *See* TEX. R. APP. P. 38.1(i); *Linney v. State*, 401 S.W.3d 764, 782-83 (Tex. App.—Houston [14th Dist.] 2013, no pet.)(overruling as inadequately briefed appellant's conclusory contention that cumulative harm affected his substantial rights). Appellant's seventh issue is overruled.

## IX.   CONCLUSION

We affirm the trial court's judgment.

GREGORY T. PERKES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
30th day of December, 2013.