**Michael Brandon GLOEDE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–09–00457–CR.**

Court of Appeals of Texas,
Beaumont.

Submitted on Nov. 5, 2010.

Decided Dec. 15, 2010.

Stephen A. Simonsen, Conroe, TX, for Appellant.

Brett W. Logon, Dist. Atty., Joel Daniels, Marc Brumberger, Asst. Dist. Attys., Conroe, for state.

Before GAULTNEY, KREGER, and HORTON, JJ.

## OPINION

HOLLIS HORTON, Justice.

Lori Randall died from the head injury she suffered after spending the weekend with her boyfriend, Michael Brandon Gloede. The State indicted Gloede for murder and alleged that he struck Lori on her head. After a jury trial, the jury found Gloede guilty of manslaughter, a lesser-included offense. Gloede elected to have the trial court assess his punishment, and the trial court sentenced him to ten years in prison.

Gloede presents two issues for our review. In issue one, Gloede asserts the trial court erred by allowing the prosecutor to use a plastic liquor bottle as a demonstrative exhibit during final argument. In issue two, Gloede asserts that the evidence is insufficient to support the jury's verdict. We affirm the trial court's judgment.

### Factual Background

According to Jennifer Sunday, Lori's sister, Lori and Gloede had an "on and off" relationship over the course of two to three years. On Saturday, April 29, 2006, Lori brought Gloede to a house where she was living with her grandmother. Lori got her "stuff" and left with Gloede.

Around 7:30 p.m. on Saturday, April 29, 2006, J.M.,[1] a minor, was driving around when she saw Lori sitting in her parked car in Gloede's driveway. J.M. and Lori were friends. J.M. testified that she noticed that Gloede was sitting in the passenger seat of Lori's car. As J.M. pulled into the driveway, she noticed that Lori got out of her car. At that point, Gloede got out of the car, told J.M. that he and Lori were talking, and he asked J.M. to leave. As J.M. pulled away from Gloede's house, she saw Gloede choking Lori. According to J.M., "he was just shaking her and her head was going back and forth and that's all I saw." J.M. called Lori's sister and

---

1. Because J.M. was a minor at the time of trial, we identify her by her initials.

told her that she saw Lori and Gloede arguing and that Gloede "put his hands on [Lori]."

Cynthia Gerard, who was Lori's friend and who lived across the street from Gloede's residence, testified that Lori came to her house on the Saturday afternoon of April 29, 2006. According to Cynthia, Lori appeared to be upset and in fear of Gloede. She also thought that Lori had been drinking. According to Cynthia, later that same day, she heard Lori and Gloede arguing; Cynthia then heard someone pull into Gloede's driveway and later drive away. Cynthia indicated that it was not uncommon for her to hear Gloede and Lori arguing.

Cynthia also explained that on Sunday evening, April 30, 2006, Gloede asked her for some medication to treat Lori because she had complained of a headache. At that time, according to Cynthia, Gloede "seemed like he was messed up on something. He seemed agitated, antsy." Cynthia saw Gloede again when he came to her house and told her that Lori had died. Cynthia described Gloede as seeming to be agitated and upset. When he told Cynthia that Lori died, Cynthia explained that he was crying. She further explained that during this visit, "[h]e didn't look anybody in the eye. And he left very shortly thereafter. He did not stick around."

Buffy Jacobs, one of Lori's friends, lives four houses from Gloede's residence. According to Buffy, for approximately eight years, she had regularly obtained prescription drugs from Gloede's father. Buffy stated that "[a] couple of times" before Lori's death, Lori told her that she was scared of Gloede. On May 1, 2006, the day that Lori was taken to the hospital, Buffy went to Gloede's residence around 8:00 a.m. to see Lori. Gloede's father told her that Lori was not there. Buffy returned to her home, but when she was unable to

locate anyone who knew Lori's whereabouts, she returned to Gloede's house. When Buffy again asked for Lori, Gloede's father indicated that he had not seen her.

On the morning of May 1, 2006, paramedics employed by the Lake Conroe Fire Department responded to a call for assistance at Gloede's residence. They arrived around 10:00 a.m. Nicholas Daniel, a paramedic that responded to the call, testified that upon entering the bedroom he saw Lori lying on her back on the floor. Daniel explained that he noticed bruising on Lori's face and arms, and a hematoma, or swelling, on Lori's head. When Daniel first assessed Lori, she was unconscious and she was not breathing normally. After removing Lori from the residence, he turned her care over to Brian Piatkowski, a paramedic employed by the Montgomery County Hospital District. Shortly thereafter, an air ambulance took Lori to Methodist Hospital in Houston.

Buffy Jacobs testified that she heard the sirens and saw the paramedics arrive at Gloede's residence. Buffy related that she ran in the door behind the paramedics, and, upon entering the back bedroom, she saw Lori lying unconscious on the floor. As the paramedics brought Lori out of the house, Buffy explained that she saw the sheet the paramedics were using to carry Lori slip, which allowed the back of Lori's head to hit the top of the step.

Buffy also testified that on Monday evening, May 1, 2006, Gloede told her that he and Lori had been "in an altercation over her being—leaving—leaving drunk. He took the bottle from her. And they had gotten in another scuffle and she had gotten hit over her head." In subsequent testimony, Buffy clarified that Gloede told her that "he grabbed the keys and the bottle from [Lori] and that they were in a scuffle and that he did hit her over the head with the bottle."

On May 4, 2006, three days after arriving at the hospital, Lori died. Dr. Dwayne Wolf's autopsy report attributed Lori's death to the following:

> ... blunt head trauma, resulting in a subdural hematoma. The manner of death however, is less clear. History suggests an altercation preceded the head injury; however, police were unable to confirm the details of an altercation. The injuries (especially following surgical manipulation) cannot be distinguished from accidental injuries (a fall for example). Therefore, the manner of death will be undetermined.

During the trial, Dr. Wolf explained that blunt force trauma can occur either by striking the body with a blunt object or the body's falling onto a blunt object. Dr. Wolf testified that he could not tell from his post-mortem examination whether a blow or a fall was responsible for the blunt force trauma which had caused Lori's death. According to Dr. Wolf, Lori's subdural hematoma had been caused by blunt force trauma that probably occurred between April 28, 2006, and May 1, 2006.

During the guilt-innocence phase of the trial, four witnesses were called to testify by Gloede. One of the witnesses was paramedic Brian Piatkowski, who indicated that when he arrived, Lori was in the front yard and was unconscious and unresponsive. He noticed no abnormalities to Lori's head, and he felt that Lori was suffering from "bleeding, intracranial hemorrhage." Piatkowski described Lori as critically ill or injured, and he acknowledged that he possibly missed some of Lori's injuries if they were covered by her hair or by equipment.

Kimberly Daoudi, who was acquainted with the Gloedes, indicated that she went to Gloede's home on Saturday afternoon, April 29, 2006, between 4:30 and 5:00 p.m. When she pulled into Gloede's driveway, she noticed Lori and Gloede in a car parked in the street. She saw Lori get out of the car and then stumble. Daoudi thought that Lori fell down because when Lori stumbled, Lori disappeared behind the car. Kimberly testified that she saw Lori get back up, and she saw Lori and Gloede arguing over whether Gloede would return her car keys. Based on these observations, Kimberly explained that she thought Lori had either been drinking or taking drugs. Kimberly then explained that she went inside the house to talk to Gloede's father, Fred. Lori and Gloede were still there when Kimberly left a short time later.

Donald Grissom III, Gloede's friend, testified that Lori and Gloede came to his home on Saturday evening, April 29, 2006. He thought that both Lori and Gloede were high. While he and Gloede looked at his boat, he heard Lori throwing up. At that point, Gloede told him Lori was sick, and that they had to go. Grissom testified that he had not observed any signs that Lori had been injured, but he also stated that he was not looking to see whether she had suffered any injuries.

Gloede also called Dr. Vladimir Parungao, a board certified pathologist, to express an opinion on the cause of Lori's death. Dr. Parungao testified that he had read the autopsy report and that he did not disagree with it. Then, after being shown several exhibits depicting Lori's bruises, Dr. Parungao indicated the bruises were caused when Lori had been struck in different places because she had an unstable gait. Dr. Parungao testified that Lori had an acute subdural hematoma, which he described as having occurred within five days of her death. Dr. Parungao testified that striking another with a plastic bottle "usually [does not] cause subdural hematoma in a head injury." Dr. Parungao explained that the bruise to

Lori's head was likely attributable "to hitting somebody hard or falling [on] something hard[.]" Dr. Parungao testified that Lori's medical records contain a drug screen which had been obtained upon her admission to the hospital. Lori's drug screen was positive for the presence of valium, cocaine, benzodiazepine, and barbiturates. Dr. Parungao did not testify about the levels of these drugs in Lori's system.

Dr. Parungao testified that all kinds of objects, including a person's hand, are capable of causing a subdural hematoma. He also acknowledged that throwing up is a symptom that is a common sign of a person's having suffered a head injury. Nevertheless, based on the autopsy pictures, Dr. Parungao explained that falls are a more common cause of subdural hematomas than being hit in the head with a plastic bottle. Dr. Parungao testified that he had never seen a subdural hematoma caused by hitting a person with a plastic bottle.

In closing argument, the State argued that Lori's subdural hematoma was caused when she was hit in the head with a plastic bottle. Gloede's attorney, on the other hand, argued that the evidence showed that Buffy's testimony was not credible. Gloede's attorney also argued that Lori's head injury had occurred before she argued with Gloede on Saturday afternoon, as Lori had complained to her son on Friday that she was suffering from a headache. Gloede's attorney then argued that Lori must have injured herself in a fall while she was drunk or taking drugs, and he asserted that Lori's death was her own fault because she had chosen not to go to the hospital.

The trial court submitted issues on murder, manslaughter, aggravated assault, criminally negligent homicide, and assault. The jury found Gloede guilty of manslaughter, but then answered "We do not" on an issue inquiring about whether Gloede used a bottle as a deadly weapon during the commission of the offense. After hearing the punishment evidence, the trial court sentenced Gloede to ten years of confinement in the Correctional Institutions Division of the Texas Department of Criminal Justice.

## Standard of Review

In issue one, Gloede challenges the prosecutor's use of a plastic bottle during closing argument because the bottle was never offered into evidence during Gloede's trial. The Code of Criminal Procedure gives the presiding judge the responsibility to regulate jury argument. *See Brown v. State*, 475 S.W.2d 938, 957 (Tex.Crim.App.1971) (applying article 36.07 to jury argument), *overruled on other grounds, Bradford v. State*, 608 S.W.2d 918, 919–21 (Tex.Crim.App.1980); *see also* Tex.Code Crim. Proc. Ann. art. 36.07 (West 2007). Trial courts have significant discretion to control the arguments offered on a party's behalf, and a trial court's rulings controlling argument are subject to reversal only when that discretion is abused. *Hall v. State*, 58 Tex.Crim. 512, 126 S.W. 573, 573 (1910) (recognizing that it "is well settled that the extent and manner of argument are confined largely to the discretion of the trial court, and that it is not subject to revision, except in a clear case of abuse"). For improper argument to result in reversible error, the argument must (1) be "violative of a statute[,]" (2) inject "a new and harmful fact into the case[,]" or (3) be "manifestly improper, harmful and prejudicial to the rights of the accused." *Wilson v. State*, 938 S.W.2d 57, 59 (Tex.Crim.App.1996). If a jury argument exceeds the bounds of proper argument, the trial court's refusal to grant the defendant's objection to the argument is

not reversible error unless it affects the defendant's substantial rights. *See* Tex. R.App. P. 44.2(b); *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex.Crim.App.2000); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim.App.1998). In determining whether the appellant's substantial rights are affected by improper argument, we balance "the following three factors: (1) severity of the misconduct (prejudicial effect), (2) curative measures, [and] (3) the certainty of conviction absent the misconduct." *Martinez*, 17 S.W.3d at 692–93; *see also Mosley*, 983 S.W.2d at 259.

■ Gloede's second issue challenges the trial court's denial of his motion for instructed verdict. A motion for directed verdict is a challenge to the legal sufficiency of the evidence. *See Williams v. State*, 937 S.W.2d 479, 482 (Tex.Crim.App.1996); *Cook v. State*, 858 S.W.2d 467, 470 (Tex. Crim.App.1993); *Madden v. State*, 799 S.W.2d 683, 686 (Tex.Crim.App.1990) ("A challenge to the trial judge's ruling on a motion for an instructed verdict is in actuality a challenge to the sufficiency of the evidence to support the conviction."). Therefore, we apply the same standard as applied to challenges to the legal sufficiency of the evidence in reviewing Gloede's second issue.[2]

In a legal sufficiency review, we consider all of the evidence in the light most favorable to the verdict, and determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 898–900 (Tex.Crim.App.2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App.2007). However, under a legal sufficiency review, we " 'may not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the fact-finder.' " *Williams*, 235 S.W.3d at 750 (quoting *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App.1999)). We are to give the trier-of-fact deference to " 'fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App.2007)).

### Final Argument

First, we address Gloede's complaint concerning the prosecutor's use of a plastic bottle in final argument. When the prose-

---

**2.** In arguing his second issue, Gloede's brief states we should review his issue based on a legal sufficiency standard, but he then references *Johnson v. State*, in which the Court of Criminal Appeals discusses how a factual sufficiency standard that is used in civil cases applies in criminal cases. 23 S.W.3d 1, 11–12 (Tex.Crim.App.2000) (explaining the application of a criminal factual sufficiency standard), *overruled by Brooks v. State*, 323 S.W.3d 893, 912–13 (Tex.Crim.App.2010). Gloede's brief, in discussing the standard of review we should apply to issue two, also refers to *Evans v. State*, 202 S.W.3d 158, 161 (Tex.Crim.App.2006) (applying the legal sufficiency standard). Because an attack on the denial of a motion for directed verdict raises a legal sufficiency complaint, but Gloede's argument references both factual and legal suf-

ficiency standards, it is not entirely clear what standard Gloede contends should be employed in review of the complaints he makes in issue two. Nevertheless, in *Brooks*, the Court of Criminal Appeals clarified that there is no meaningful distinction between the legal sufficiency standard and the factual sufficiency standard in reviewing sufficiency challenges in criminal cases, and it directed that the legal sufficiency standard in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks*, 323 S.W.3d 893, 895.

cutor first displayed the bottle to the jury, he stated: "Taking a bottle and swinging it with enough force to cause...." At that point, Gloede's attorney objected, stating:

> [Defense Attorney:] Judge, I'm going to object to a demonstrative [exhibit] not previously displayed to the defense and which we would object to using in the closing as not being in evidence.

The trial court overruled the defendant's objection. Then, the prosecutor continued:

> [Prosecutor:] Didn't even try that hard. Think about the force. The weight of the liquid transferred from the bottle to the head. You don't do that unless you intend to hurt somebody bad.

■■■ Initially, we note that the Court of Criminal Appeals has given trial courts the discretion to admit into evidence instruments of a similar type to the one used in the commission of an offense where the exemplar "is relevant and material to an issue in the trial and is not overly inflammatory, and the original, if available, would have been admissible at trial." *Simmons v. State*, 622 S.W.2d 111, 113 (Tex.Crim.App.1981). While an exemplar of the weapon used in the commission of a crime need not be an exact match, where the characteristics of the exemplar weapon and the one used in the commission of a crime are not similar, "the probative value of the non-exact weapon or instrumentality will be very slight. It would be an abuse of discretion to admit the exhibit in evidence under those circumstances." *Id.* at 114.

In Gloede's case, none of the witnesses that testified during the trial gave a detailed description of the bottle that Gloede is alleged to have used to strike Lori's head. Nor was the bottle that the prosecutor displayed in final argument introduced as demonstrative evidence during the guilt-innocence phase of Gloede's trial. Buffy Jacobs, the witness who testified

that Gloede told her that he hit Lori with a bottle, did not report that Gloede gave her further descriptive details about the bottle, such as its size or contents, when he told her about the altercation. During cross-examination, Buffy indicated that the bottle was a hard, brown plastic bottle, although her testimony does not indicate how she learned this added detail. Nevertheless, nothing in the record reflects that the bottle displayed in final argument was of a similar size or shape as the bottle the prosecutor chose to use during closing argument. Based on the evidence in the record before us, the State failed to lay the predicate that would have been necessary had the prosecutor asked to admit the bottle as one that was similar to the one the State alleged had been used during the commission of the offense. *See* Tex.R. Evid. 402 ("Evidence which is not relevant is inadmissible.").

■■■ The bottle was used by the prosecutor during final argument. With respect to arguments made by the attorneys in summation, the Court of Criminal Appeals has stated that "[p]ermissible jury argument falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement." *Cannady v. State*, 11 S.W.3d 205, 213 (Tex.Crim. App.2000). In this case, the State argues that the bottle was a visual aid that merely reflects the evidence adduced during trial. But bottles, like knives, come in a variety of sizes. One of the primary disputes between the parties was whether Gloede could have used a plastic bottle with sufficient force to cause the blunt force trauma which resulted in Lori's suffering a subdural hematoma. Based on the evidence in the record, we are unable to conclude that the bottle the State chose to use in its final argument was merely the equivalent

of an oral summary of the evidence admitted during the trial. We conclude that absent a description of the bottle's size and contents, the prosecutor's use of a bottle holding 750 milliliters of fluid does not amount to a summing up of the evidence.

However, summation is not the only area of proper argument. An attorney is allowed to answer arguments of opposing counsel during final argument. *See Cannady,* 11 S.W.3d at 213. One theme advanced through the defendant's examination of Dr. Parungao was that Lori's injuries were probably attributable to a fall, and were probably not caused by receiving a blow from a plastic bottle. During his direct examination, Dr. Parungao explained: "A plastic bottle usually [does not] cause subdural hematoma in a head injury. Even [if] you hit the head with [the bottle]—it's not the same as the glass bottle because the plastic bottle if you hit it—so the energy is not toward. It went inside." Thus, Dr. Parungao implied that a plastic bottle was not capable of causing Lori's fatal injury. Nevertheless, during cross-examination, Dr. Parungao recognized that if swung hard enough, a hard plastic bottle containing liquid could cause a subdural hematoma.

In final argument, the State's prosecutor used the plastic bottle to argue that a bottle containing a liquid could be used with sufficient force to indicate that the person using it intended to cause a serious injury. Since one of the themes of the defendant's case was that a plastic bottle could not have caused Lori's head injury, it was not improper for the prosecutor to reply by demonstrating how a plastic bottle could be used in a manner sufficient to cause a mortal injury. In this case, the prosecutor used the bottle in a limited way to answer the argument of opposing counsel. *See id.* We hold that the use of the plastic bottle under these circumstances

was a matter left to the trial court's discretion, as the bottle's use was limited to replying to the argument which had been raised by the defendant through the testimony of one of his witnesses.

We hold the trial court did not abuse its discretion by allowing the prosecutor to use a plastic bottle to demonstrate that a bottle containing liquid had the capacity to cause the type of injury that Lori suffered. We overrule issue one.

### Legal Sufficiency

A person commits the offense of manslaughter if he recklessly causes the death of an individual. Tex. Penal Code Ann. § 19.04(a) (West 2003). "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tex. Penal Code Ann. § 6.03(c) (West 2003). "[P]roof of a culpable mental state generally relies on circumstantial evidence." *Dillon v. State,* 574 S.W.2d 92, 94 (Tex.Crim.App.1978). "[W]hether one is aware of a requisite risk or simply should be aware of it, is a conclusion to be drawn through inference from all the circumstances by the trier of fact." *Id.* Reviewing the evidence under the *Jackson* standard requires that we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences from it, a rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781.

The jury is the exclusive judge of the facts proven in a case. *See* Tex.Code Crim. Proc. Ann. arts. 36.13 (West 2007), 38.04 (West 1979); *Lancon v. State,* 253 S.W.3d 699, 705 (Tex.Crim.App.2008); *Ra-*

*chal v. State,* 917 S.W.2d 799, 805 (Tex. Crim.App.1996). As judges of the facts, juries are free to judge the weight to be given the testimony and are free to accept or reject any or all of the evidence presented by either side. *See Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex.Crim.App. 2000). In other words, juries are allowed to believe or disbelieve any part of the testimony of any witness. *See Jones v. State,* 984 S.W.2d 254, 257 (Tex.Crim.App. 1998).

Reconciling conflicts in the evidence is one of the functions of the trier-of-fact. *See* Tex.Code Crim. Proc. Ann. arts. 36.13, 38.04; *Losada v. State,* 721 S.W.2d 305, 309 (Tex.Crim.App.1986). Circumstantial evidence alone can support a defendant's conviction. *See Clayton v. State,* 235 S.W.3d 772, 778–79 (Tex.Crim.App.2007) (noting that the evidence allowed the jury to rationally find the defendant was with the decedent during the period when he was shot, which when combined with other incriminating evidence, constituted sufficient evidence that the defendant was guilty). In this case, the jury heard evidence that Gloede was with Lori during a period in which she probably suffered a head injury. There was also evidence that the two were seen arguing on Saturday, evidence that Gloede told Buffy Jacobs after Lori was hospitalized that he hit her on the head, and evidence that on the evening after their altercation on Saturday, Lori was suffering from symptoms commonly associated with head injuries.

Since Gloede's indictment did not allege the type of weapon he is alleged to have used to commit the offense, the State was not required to prove that Gloede had used a bottle to inflict Lori's injury. Because the jury could accept some parts of testimony and reject others, it was free to accept Buffy's testimony that Gloede struck Lori in the head, and at the same time reject Gloede's statement that he used a plastic bottle to do so. Thus, the jury was free to resolve conflicts in the evidence by deciding that Gloede struck Lori in the head and caused her death, and, at the same time in connection with the deadly weapon finding, refuse to find that he did so by using a plastic bottle.

The jury in Gloede's case could also consider circumstantial evidence implicating Gloede in Lori's death. The circumstances include evidence that Lori and Gloede had been together during the periods immediately before Lori's hospitalization. Given the nature of Lori's head injury, the jury was entitled to consider whether Lori's symptoms of severe headache and vomiting, reported by Donald Grissom when he saw her on Saturday night, were consistent with Lori's having received a head injury on Saturday around the times that Lori and Gloede were seen arguing. The jury was also entitled to consider the circumstance that Lori had reported she was afraid of Gloede, and to consider why Gloede's father would have denied Lori's presence in his home when the circumstances showed she was there. The jury was also entitled to consider the testimony that Gloede seemed nervous following Lori's hospitalization, as well as the fact that the police were unable to question him shortly after Lori's death because he moved from his father's home. The jury heard that Gloede and Lori had been arguing, heard evidence of the tempestuous nature of their relationship, and heard testimony by physicians that blows by a person's fist could cause trauma sufficient to cause a subdural hematoma. The jury was also entitled to consider Gloede's recorded statement, which the trial court admitted into evidence. During the recorded statement, Gloede told the investigator that the only fall that Lori had suffered during the weekend occurred when she exited her car and fell sideways, resulting in scrapes to

her knees and arms. Gloede specifically told the investigator that he did not see her hit her head, that Lori had not grabbed her head, nor did she indicate that she hit her head. While there was evidence that the paramedics allowed Lori's head to strike a step as they were removing her from Gloede's house, the jury could conclude that she had suffered a subdural hematoma before she was removed from the house. While the jury also heard generalized testimony that head injuries from falls are experienced by alcoholics, and heard testimony that Lori had been intoxicated and was taking drugs over the course of the weekend, no witness testified that he had seen Lori fall and hit her head before being attended by paramedics.

Gloede's admission that he struck Lori in the head, when considered and combined with the cumulative force of the incriminating circumstantial evidence, allowed a rational jury to reasonably find, beyond a reasonable doubt, that Gloede was guilty of manslaughter. *See Clayton,* 235 S.W.3d at 782. After carefully reviewing all of the evidence in the light most favorable to the jury's verdict, we hold that the evidence is legally sufficient to support the jury's guilty verdict.

### Conclusion

Having overruled both of Gloede's issues, we affirm the judgment of the trial court.

AFFIRMED.