**Tyrone Louis GILBERT, Appellant**

v.

**The STATE of Texas, Appellee**

**NO. 14–15–00310–CR**

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed March 8, 2016

Rehearing and Rehearing En Banc Overruled March 31, 2016

David W. Barlow, Beaumont, TX, for Appellant.

Wayln G. Thompson, Beaumont, TX, for State.

Panel consists of Justices Jamison, Donovan, and Brown.

## OPINION

Martha Hill Jamison, Justice

A jury convicted appellant Tyrone Louis Gilbert of murder. The trial court sentenced appellant to imprisonment for life in the Institutional Division of the Texas

Department of Criminal Justice.[1] Appellant challenges the sufficiency of the evidence to support his conviction and asserts the trial court erred in charging the jury, denying his motion for new trial, and allowing the State to engage in prejudicial jury argument. We affirm.

## I. Sufficiency of the Evidence

In his first three issues, appellant argues the evidence was legally insufficient to prove that he intentionally or knowingly caused the death of the complainant. Specifically, appellant contends the evidence failed to prove (1) he was the person who caused the death of the complainant, (2) the offense was committed intentionally, or (3) the offense was committed knowingly.

### Standards of Review

In assessing whether evidence is sufficient to support a conviction, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex.Crim.App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We may not substitute our judgment for that of the fact finder; rather, we defer to the fact finder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App.2010). If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm.

*McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim.App.1997).

As relevant to the facts of this case, a person commits the offense of murder if (1) he intentionally or knowingly causes the death of an individual; or (2) he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code § 19.02(b)(1) & (2). A person acts intentionally with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. Tex. Penal Code § 6.03(a). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). Proof of a mental state almost always depends upon circumstantial evidence. *Gloede v. State*, 328 S.W.3d 668, 676 (Tex.App.–Beaumont 2010, no pet.). Intent to cause death may be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex.Crim.App.2004); *Williams v. State*, 449 S.W.2d 271, 276 (Tex.Crim.App.1969). A jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim.App.1996); *Andrews v. State*, 09–13–00407–CR, 2014 WL 6984049, at *2 (Tex. App.–Beaumont Dec. 10, 2014, pet. ref'd) (mem. op., not designated for publication). A firearm is a deadly weapon per se. Tex. Penal Code § 1.07(a)(17)(A).

---

**1.** This appeal was transferred to this court from the Ninth Court of Appeals. In cases transferred from one court of appeals to another, the transferee court must decide the case in accordance with the precedent of the transferor court if the transferee court's decision would have been inconsistent with the precedent of the transferor court. *See* Tex. R.App. P. 41.3.

In a jury trial, the jury is the exclusive authority on the credibility of the witnesses and the weight to be given their testimony. *Sutton v. State*, 469 S.W.3d 607, 614 (Tex.App.–Beaumont 2015, no pet.). We give deference to the jury's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Any inconsistencies in the evidence are matters to be weighed by the jury in its determination of guilt or innocence and do not alone render the evidence insufficient. *See Amador v. State*, 376 S.W.3d 339, 345 (Tex.App.–Houston [14th Dist.] 2012, pet. ref'd); *see also Kesaria v. State*, 148 S.W.3d 634, 641 (Tex. App.–Houston [14th Dist.] 2004) ("[A] decision is not manifestly unjust merely because the jury resolved conflicting views of the evidence in favor of the State."), *aff'd*, 189 S.W.3d 279 (Tex.Crim. App.2006).

### *The Evidence*

Bryan Hebert was shot and killed at the Prince Hall apartment complex on December 13, 2007. Dr. Tommy J. Brown performed the autopsy on Hebert and testified the cause of Hebert's death was three gunshot wounds to the head "at the hands of another."

Carlton Alexander testified he was "hanging around" Deshard Starks and George Sallier, who were playing dice when first Herbert, then later, another man who was carrying a bag, approached. Alexander thought the man with the bag was from Louisiana and had past problems with Hebert. Alexander heard shots and thought the shooter "could've been" the man with the bag, but he did not see the gun or who fired it. Alexander ran when he heard the first gunshot. Alexander testified that he identified appellant in a lineup as the person with the bag who walked up to the dice game. Alexander then identified appellant in the courtroom.

Sallier was shooting dice when Hebert arrived. Another man Sallier did not know spoke to Hebert. About five minutes later, shots were fired. Sallier testified that neither he, Starks nor Alexander fired a shot, and he did not know who did. Sallier ran when the shooting started. Sallier had heard Hebert had issues with a man named Tyrone from Louisiana who drove a purple Suburban or Tahoe. Sallier identified appellant in a lineup as the person he knew as Tyrone and identified him in the courtroom.

Natalie Gilbert, appellant's wife, testified appellant was from Monroe, Louisiana, and drove a purple Tahoe. On the night of the shooting, she was home with her children and appellant. Natalie fell asleep around 9:30 p.m. and woke up about 1:30 a.m. Appellant was home when she woke up. Later that night, a neighbor knocked on the door and said something had happened to Hebert. Natalie testified that she knew Hebert from the apartment complex but did not personally know him. Natalie knew that appellant and Hebert had problems in the past but she did not believe there was "bad blood" between them. According to Natalie, three or four months before the shooting, Hebert came into her apartment, knocked her down, and took $400. She told appellant and he discussed it with Hebert. Natalie believed Hebert agreed to pay the money back. Natalie had heard rumors that she and Hebert were "messing around."

After Hebert was shot, an officer came to the apartment and asked if they had any guns. Natalie told the officer she had an AR–15.[2] The gun usually was kept under her mattress, but it had been moved

---

2. A semi-automatic rifle.

to the children's bedroom. Natalie testified that she did not move the gun so appellant must have placed it there.

Starks testified that Hebert, a friend of his, was at the dice game. Starks ran away with Sallier after hearing gunshots. Starks testified that appellant was at the scene that night, but he did not know if appellant shot Hebert.

Rodney Harrison was a detective sergeant with the Port Arthur Police Department at the time of the shooting. According to Harrison, Starks told him that while they were shooting dice, Hebert walked up and then another man approached. Starks knew the other man as Tyrone, who drove a purple Suburban and was from Louisiana. Starks had seen Tyrone before and knew he carried a gun. Tyrone had a backpack and acted as if he was going to hit Hebert with it. Tyrone pulled out a gun and started shooting. Harrison presented a photographic lineup to Starks and he identified Tyrone as the shooter. Harrison identified appellant as the same Tyrone that Starks had identified.

Harrison testified that he also interviewed Roy Anderson, who identified Starks as the shooter. After interviewing Starks and Alexander and re-interviewing Anderson, however, Harrison believed that Starks did not do it.

Bobby Francois was Hebert's cousin and lived with Hebert's sister, Crystal. Francois knew appellant was from Louisiana. Francois testified that in November 2007, appellant came to Crystal's looking for Hebert because Hebert had something of his. Appellant had a "long" gun like a shotgun or rifle. Francois had seen appellant with a gun before. Francois and Crystal told Hebert that appellant was looking for him and Hebert was scared.

Francois saw Natalie and appellant argue. Appellant blamed Natalie for Hebert's having his "stuff" and appellant threatened to kill her. Francois recounted two other incidents occurring that month: appellant started shooting at Hebert while chasing him out of Natalie's house and Hebert and appellant pulled guns on each other at a club.

On the night of the shooting, around 12:00 p.m. to 1:00 a.m, Francois saw appellant leave the Prince Hall apartments driving his truck. Francois said it looked like a Suburban and was brownish in color. Subsequently, Francois received a phone call that Hebert had been shot. Francois and Crystal went to appellant's apartment, where appellant opened the door holding a long gun and sweating. When confronted, appellant said he did not shoot Hebert and had been in the apartment all night. Francois told appellant that he had just seen him leave the apartments. Francois testified that while appellant was awaiting trial, he called Francois and again said he did not kill Hebert.

Crystal Hebert testified that Hebert and Natalie "would mess around." On November 17, 2007, Natalie came to Crystal's apartment looking for Hebert and asking for his cell phone number. When Crystal said she did not have the number, appellant appeared and put a gun in her face. Crystal testified that Francois was not there but that she told him about it. Appellant told Crystal to tell Hebert that if he did not come "with his money, his drugs, and his gun that he was going to kill him."

Crystal also saw appellant and Natalie arguing. Appellant put the gun close to Natalie and "told her he ought to blow her head off 'cause she the reason all his stuff had got taken." Appellant then told Crystal and Francois that they better find Hebert before he did. Crystal thought that meant appellant was going to kill Hebert. Crystal told Hebert what appellant said.

When Hebert left the apartment, appellant saw him and gave chase, shooting at Hebert. Hebert jumped in a car that was leaving and appellant jumped in his truck and followed, continuing to shoot.

Subsequently, Crystal, Hebert and others went to a club. Appellant was there, dressed all in black. Crystal was told appellant and Hebert had drawn guns on each other, but when the police arrived, they both ran away.

Later that week, Hebert came by Crystal's apartment and indicated that he was going to try to fix the problem with appellant. Hebert and appellant met and Hebert gave appellant some money. After that, Hebert visited her apartment looking worried and scared. On December 13, 2007, Crystal was asleep when friends woke her up and told her that Hebert had been shot. As Crystal was leaving the apartment complex to go to the scene, appellant was arriving.

After seeing Hebert's body, Crystal and Francois went to appellant's apartment, "[b]ecause we knew he did it." Appellant answered the door. Natalie was there and appeared to have been asleep. Appellant was in his boxers as if he had been asleep but Crystal had just seen him arrive. Appellant was sweating, nervous and had a big black gun. Crystal testified that the gun appellant threatened her with on November 17 was smaller than the gun he had that night. Crystal told appellant that Hebert was shot and he was the only one looking for him. Appellant told them to get away from his house. A few days later, Natalie admitted to Crystal that she and Hebert had a sexual relationship.

Crystal testified that she did not come forward immediately because she was afraid of appellant. Appellant was still living in the apartment complex from December 2007 until June 2009.

Kary Dennis testified on behalf of the prosecution while criminal charges were pending against him. Dennis testified that no promises were made in exchange for his testimony, but admitted he hoped it might be considered. Dennis met appellant in the county jail in the summer of 2014. Appellant told Dennis that he was there for the murder of Bryan Hebert. Appellant told Dennis that "[h]e was sleeping with my wife, going inside my house" and stole a gun and some drugs. Appellant said, "he wasn't going to make me look like I was a ho. And I wanted my stuff back." Appellant told Dennis that he was from Louisiana. Dennis knew Natalie's brother from high school. Dennis testified that appellant told him about chasing Hebert through the apartments and the incident at the club. Appellant told Dennis that he was going to kill Hebert at the club but did not shoot then because the police were coming. Appellant said Hebert was with his sister and some friends.

Appellant told Dennis that he got a phone call and drove over to the Prince Hall apartments where he saw "them shooting dice." Appellant parked farther down and walked back. He looked around the corner, leaned back, cocked his weapon, and when he came back around he fired a shot causing Hebert, who was crouching down, to flip over onto his back. Appellant ran forward and started shooting, firing several more shots into Hebert. Appellant knew he hit Hebert in the head because a cap or something flew off. A red cap was found near Hebert's body. Appellant took off running and got in his truck. Appellant told Dennis that he was caught with another gun, not the one he used to kill Hebert.

Dennis had two 2012 charges pending against him. Dennis admitted that he had rejected a plea bargain offer for twenty-five years on those charges prior to his

conversation with appellant about Hebert's murder. At the time of trial, Dennis was out of jail on a personal recognizance bond in exchange for testifying.

### Analysis

■ Appellant relies upon the lack of eyewitness testimony and Dennis's lack of credibility to support his claim that the State failed to prove he was the shooter. Contrary to appellant's assertion, however, Dennis's testimony was not the only evidence from which a rational trier of fact could have found it was appellant who shot Hebert. Although no eyewitness testified in court to seeing appellant shoot Hebert, the State may prove appellant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex.Crim.App.2009).

Alexander identified appellant in a lineup as the person who walked up to the dice game with a bag and then identified appellant in the courtroom. Starks testified that appellant walked up to the dice game that night. Sallier testified that neither he, Starks, nor Alexander fired a shot. Francois and Crystal testified that appellant had once drawn a gun on Hebert. From this evidence, the jury could reasonably have inferred that appellant was the person who did the shooting.

■ Appellant argues the State produced no testimony concerning appellant's mental state, a required element of the offense of murder. However, "[m]ental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs." *Beaty v. State*, 156 S.W.3d 905, 908 (Tex.App.–Beaumont 2005, no pet.). The witnesses agreed that a man shot Hebert with a firearm. Hebert, and only Hebert, was hit—by three shots in the head and one in the chest/abdominal area. Natalie testified that appellant and Hebert had problems. Francois testified that appellant previously was looking for Hebert, which scared Hebert. Dennis testified appellant said he was going to kill Hebert at the club but stopped when the police approached. A rational trier of fact could find that firing a deadly weapon at another person multiple times was an act clearly dangerous to human life that caused the individual's death. They further could infer appellant's intent to cause Hebert's death from his acts, words, and conduct. Accordingly, the evidence is sufficient to support the jury's finding that the offense was committed intentionally or knowingly.

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence is sufficient to support the jury's finding that appellant committed the offense of murder. Appellant's first three issues are overruled.

## II. CHARGE ERROR

■ Appellant's fourth issue asserts the trial court committed fundamental error by charging the jury to convict appellant of murder by finding that he acted intentionally or knowingly with regard to the conduct that ultimately lead to the complainant's death. Appellant complains that because the abstract portion of the court's charge defining intentionally and knowingly included "with respect to the nature of his conduct" the instruction was erroneous.

■ Our first duty in analyzing a criminal jury charge issue is to decide whether error exists. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex.Crim.App.2009). If error is found, the degree of harm necessary for reversal depends on whether the appellant preserved the error by objecting to the complained of instruction.

*Olivas v. State,* 202 S.W.3d 137, 144 (Tex. Crim.App.2006); *see also Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App. 1984) (op. on reh'g). If the defendant properly objected to the erroneous jury charge instruction, reversal is required if we find "some harm" to the defendant's rights. *Olivas,* 202 S.W.3d at 144 n. 21. If the error was not objected to, then reversal is required only if it was so egregious and created such harm that the defendant "has not had a fair and impartial trial." *Barrios,* 283 S.W.3d at 350. Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Marshall v. State,* PD–0509–14, 479 S.W.3d 840, 843–44, 2016 WL 146450, at *2 (Tex.Crim.App. Jan. 13, 2016) (not yet released for publication).

At trial, defense counsel did not object to the court's charge on the grounds raised on appeal. Therefore, appellant was required to show both that the trial court erred in instructing the jury and that the trial court's error caused him egregious harm. *See Olivas,* 202 S.W.3d at 144.[3]

■ Appellant's complaint relates to the following parts of the jury charge:

DEFINITIONS:[4]

. . .

INTENTIONALLY:

A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

. . .

KNOWINGLY:

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exists (sic). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

. . .

CHARGE:

Now, if you believe from the evidence beyond a reasonable doubt that in Jefferson County, Texas, on or about December 13, 2007, the defendant Tyrone Louis Gilbert, intentionally or knowingly caused the death of Bryan Dudley Hebert by shooting him with a deadly weapon, namely: a firearm, you shall find the defendant guilty of the offense of murder as alleged in the indictment.

Unless you so find, or if you have reasonable doubt thereof, you shall find the defendant NOT GUILTY."

■ Appellant contends the charge is erroneous in that it defines intentionally and knowingly with respect to the *nature* of his conduct, in addition to the *result* of his conduct, when murder is a result of the conduct offense. Regardless of whether there was error in the definition, however, the application paragraph of the charge

3. Appellant concedes egregious harm must be found here.

4. Abstract, or definitional, paragraphs in a charge serve as a kind of glossary to help the jury understand the meaning of concepts and terms used in the application paragraph, which is that portion of the jury charge that applies the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations. *See Plata v. State,* 926 S.W.2d 300, 302 (Tex.Crim.App.1996), *overruled on other grounds by Malik v. State,* 953 S.W.2d 234 (Tex.Crim.App.1997); *see also Vasquez v. State,* 389 S.W.3d 361, 366 (Tex.Crim.App. 2012).

correctly instructed the jury that they must believe beyond a reasonable doubt that appellant "intentionally or knowingly **cause[d] the death**" before they could find him guilty. (Emphasis added.) "Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious." *See Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim.App.1999). Accordingly, we determine the error, if any, did not result in egregious harm. Appellant's fourth issue is overruled.

## III. DENIAL OF MOTION FOR NEW TRIAL

■ In his fifth issue, appellant contends the trial court abused its discretion in denying his motion for new trial. Appellant asserts that after being convicted, but before being sentenced, he received information regarding an alleged agreement between Kary Dennis and the State that Dennis, testifying at trial under oath, denied existed. Appellant argues that if there were an agreement, Dennis committed perjury and a new trial on that basis should have been granted.

Affidavits by Assistant District Attorneys Patrick W. Knauth, Rachel Grove and Ashley Chase[5], and Marsha A. Normand, appointed counsel for Dennis, were submitted for the court's consideration of appellant's motion for new trial.[6]

Knauth averred to the following:

- Normand informed him that she believed there was a deal for Dennis to testify based on a conversation and file notation from Dennis's former attorney, Raquel West.

- West indicated to Knauth:

<hr/>

5. Also referred to as Ashley Molfino.

6. It is not clear from the record which party provided the affidavits. Both Appellant and

- Ashley Molfino told her that Dennis's pending cases would "go away" after he testified;

- She believed this meant Dennis would receive some form of consideration for testifying; and

- She did not communicate Molfino's statement to Dennis.

- Knauth informed appellant's trial attorney that Normand claimed a deal had been made.

- Knauth disagreed a deal was ever created.

- Knauth specifically told Grove that no deal would be offered for Dennis's testimony.

- Knauth was informed by Grove that she had made clear to Dennis there was no deal.

Grove's affidavit provides:

- No offer was conveyed to Dennis in reference to the disposition of his pending felony cases.

- Dennis was specifically told that there was no offer on his cases but his cooperation would be considered.

Chase's affidavit states:

- There was no deal to dismiss Dennis's cases in exchange for his testimony.

- Dennis was never told that his cases would be dismissed in exchanged for his testimony.

- Chase and West discussed that Dennis would be given consideration for his testimony and that his cases most likely would be "disposed of."

- Chase and West agreed not to share their discussion with Dennis because there was no deal and they did not

the State claim in their briefing to have done so.

want him to mistakenly assume there was one.

Normand's affidavit avers:

● Dennis was facing felony charges for possession of a controlled substance and evading arrest/detention.

● West advised the District Attorney's Office that Dennis had information and might be a potential cooperating witness in the case against appellant.

● After Dennis was debriefed and cooperated on several cases, the District Attorney's Office arranged to have him released on a personal recognizance bond.

● West informed her that Molfino advised her Dennis's cases would "go away" after he testified against appellant.

● Molfino and West decided their conversation would not be disclosed to Dennis.

● Normand made a note in the file the day she received it, "Cases to Be Dismissed per West."

Dennis testified that no promises were made in exchange for his testimony but he hoped it would be considered. None of the affidavits submitted by appellant establish Dennis's testimony was perjured. Although West and Normand may have expected Dennis's cases to be dismissed in exchange for his testimony, there is no evidence that Dennis was aware of her belief. To the contrary, Normand and Chase both averred that Dennis was intentionally not informed of any deal believed to have been made. Because Dennis was wholly unaware of any deal, his testimony that no promises were made did not constitute perjury.

A trial court abuses its discretion in denying a motion for a new trial when no reasonable view of the record could support the trial court's ruling. *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex.Crim.App. 2012). The record does not support appellant's allegations that Dennis's testimony was false. Accordingly, we find the trial court did not abuse its discretion in denying appellant's motion for new trial. *See Tuffiash v. State*, 948 S.W.2d 873, 879 (Tex.App.–San Antonio 1997, pet. ref'd). Appellant's fifth issue is overruled.

## IV. IMPROPER ARGUMENT

In his final issue, appellant claims reversible error occurred when the State was allowed to engage in prejudicial jury argument, denying him a fair trial.

■ Appellant complains of three instances of the State's closing argument that were objected to at trial. The trial court overruled the first objection to the following argument:

[The State]: ... I love it when a defense lawyer stands up and accuses me of a crime of saying that I'm—that we've been feeding witnesses with stories and then promising them deals to come through. I love it when they do that, except I don't. It's a little hypocritical because they accuse us of committing a crime as a prosecutor. I mean, we don't do this for the money. As a lawyer—

[Defense Counsel]: Objection, your Honor.

[The State]:—as a citizen of the United States—

[Defense Counsel]: Striking at the defendant over—

[The State]: I'm responding to—

[Defense Counsel]:—counsel's shoulder.

[The State]:—his comments.

THE COURT: Overruled. Go ahead.

The record reflects that before the State's closing argument, defense counsel argued that Dennis admitted "that prior to coming and talking to the State, he was looking at

at least 25 years, And now, after he comes forward to tell something, he's walking around with us. Folks, that's a motive to come in here and tell a story, it's a motive to lie, and it's questionable as to credibility." [7]

In general, the four proper areas of jury argument are: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answers to opposing counsel's argument; and (4) pleas for law enforcement. *Freeman v. State*, 340 S.W.3d 717, 727 (Tex.Crim.App.2011). A prosecutor risks improperly striking at a defendant "over the shoulder" of counsel when an argument refers to defense counsel personally and when the argument explicitly impugns defense counsel's character. *Weeks v. State*, 396 S.W.3d 737, 746 (Tex.App.–Beaumont 2013, pet. ref'd). Here, however, the State's response was not a personal attack on defense counsel but was instead an answer to an assertion by opposing counsel; that Dennis was motivated to testify falsely in exchange for his release on bond. *See id.* Under the circumstances, the trial court could reasonably consider the State's argument as within the scope of permissible response.

The second and third arguments complained of on appeal were as follows:

> [The State]: . . . And I can tell you that there [are] details in [Dennis's] story that only Tyrone Gilbert or someone that has the file like we have at our office would know because when I heard Kary Dennis say that, I knew that he was telling the truth.
>
> [Defense Counsel]: Objection, Your Honor. She's inserting her opinion.
>
> . . .

> [The State]: . . . [Appellant's] done it once. He's threatened to do it many times. And, I believe that he'll deliver on that again."
>
> [Defense Counsel]: Objection, Your Honor. She's inserting her opinion again.

In both instances, the objections were sustained and the jury was instructed to disregard, but the trial court denied appellant's motions for mistrial. Because the trial court sustained appellant's objections and instructed the jury to disregard the State's arguments, we proceed to determine whether the trial court abused its discretion by refusing to grant appellant's motions for mistrial. *See Archie v. State*, 340 S.W.3d 734, 738–39 (Tex.Crim.App. 2011). To evaluate whether the trial court abused its discretion in denying a mistrial for improper jury argument, we balance (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Id.* Mistrial is the appropriate remedy when the objectionable events are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant. *See id.*

In reviewing the first factor, the magnitude of any prejudicial effects of the prosecutor's comments were lessened because they were brief and not repeated. *See Archie v. State*, 221 S.W.3d 695, 700 (Tex. Crim.App.2007); *see also Kriss v. State*, 05–13–00231–CR, 2014 WL 5475453, at *5

---

**7.** Defense counsel also argued that Dennis "got into his paperwork, found out what the accusations were." It is unclear from the record whether counsel was referring to the State's file or the local newspaper.

(Tex.App.–Dallas Oct. 29, 2014, no pet.) (not designated for publication).

 The second factor looks to the measures adopted to cure the misconduct. Appellant recognizes that in most cases, the trial court's instruction to disregard will cure any error. *See Wesbrook v. State,* 29 S.W.3d 103, 115 (Tex.Crim.App. 2000). We presume that an instruction to disregard will be obeyed by the jury. *See Pierson v. State,* 426 S.W.3d 763, 778 (Tex. Crim.App.2014).

 Regarding the State's last opinion, that appellant would "deliver on that again," appellant makes no argument that the trial court's instruction to disregard was insufficient. Appellant argues that Dennis's credibility was so crucial to the jury's determination that the harm attending the State's other opinion, that he was a credible witness, was incurable. Presuming, without deciding that the State's remarks were error, they were not so indelible that the jury's ability consciously to disregard them would be overcome. *Gardner v. State,* 730 S.W.2d 675, 698 (Tex.Crim.App.1987). Only offensive or flagrant error warrants reversal when there has been an instruction to disregard, and, in the case at bar, these comments were not so flagrant that the instruction to disregard was ineffective.

Moreover, we note that appellant's assertion that no other witness tied appellant to the murder is incorrect. As our discussion above regarding appellant's challenge to the sufficiency of the evidence demonstrates, there was evidence apart from Dennis's testimony supporting appellant's conviction. We conclude the State's arguments were not so emotionally inflammatory that curative instructions were not likely to prevent the jury from being unfairly prejudiced against the appellant.

The third factor—the certainty of the conviction absent the misconduct—also weighs in favor of the trial court's ruling. As discussed above, the evidence supporting the conviction, although circumstantial, was strong. Appellant's conviction was sufficiently certain regardless of the alleged misconduct. *See Joseph v. State,* 14–12–00949–CR, 2014 WL 2446611, at *7 (Tex.App.–Houston [14th Dist.] May 29, 2014, pet. ref'd) (mem. op., not designated for publication), *cert. denied,* —— U.S. ——, 135 S.Ct. 994, 190 L.Ed.2d 871 (2015). We therefore conclude that the trial court did not abuse its discretion by denying appellant's motion for mistrial. For the reasons set forth above, appellant's sixth issue is overruled.

Having overruled all of appellant's issues, we affirm the trial court's judgment.